Filed 10/31/16

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| STEVE B. DREXLER, | B259375 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC516778) |
| v. | |
| DAVID J. PETERSEN, et al., | |
| Defendants and Respondents. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory Keosian, Judge.  Reversed.

Katchko, Vitiello & Karikomi and Michael T. Karikomi for Plaintiff and Appellant.

Ryan Datomi, Richard J. Ryan, Jeffrey T. Whitney and Dawn Cushman for Defendants and Respondents.

_____

# INTRODUCTION

Code of Civil Procedure section 340.5[1] provides that a plaintiff in an action for medical malpractice must file the action within three years of the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. We hold that, when the plaintiff in a medical malpractice action alleges the defendant health care provider misdiagnosed or failed to diagnose a preexisting disease or condition, there is no injury for purposes of section 340.5 until the plaintiff first experiences appreciable harm as a result of the misdiagnosis, which is when the plaintiff first becomes aware that a preexisting disease or condition has developed into a more serious one.

Steve Drexler filed this medical malpractice action against Dr. David Petersen, a primary care physician, Dr. Craig German, a neurologist, and their employer, HealthCare Partners Medical Group, Inc., alleging that Dr. Petersen and Dr. German negligently misdiagnosed the cause of his headaches. When finally an emergency room doctor correctly diagnosed a brain tumor as the cause of the headaches, Drexler needed emergency surgery. By that time, the tumor had grown so large that surgeons had to sever Drexler's cranial nerves to remove it, which caused Drexler loss of vision in his left eye, deafness in his left ear, facial paralysis, loss of musculature and strength, depression, and sexual dysfunction.

The trial court granted a motion by all three defendants for summary judgment on the ground that section 340.5 barred

---

[1] Statutory references are to the Code of Civil Procedure.

2

Drexler's action.  Because there are disputed issues of material fact regarding whether Drexler discovered his injury within the meaning of section 340.5 more than one year before he filed this action, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *Drexler Seeks Treatment for His Headaches*

In December 2006 Drexler consulted Dr. Petersen about headaches he had been experiencing for a month.[2]  Dr. Petersen diagnosed Drexler with tension headaches.

In January 2007 Drexler returned to Dr. Petersen, still complaining of headaches on the right side of his head and neck.  Dr. Petersen again diagnosed Drexler with tension headaches and prescribed pain medication.

In September 2007 Drexler again consulted Dr. Petersen regarding pain on the back and sides of his head.  Dr. Petersen told Drexler that tension was still causing his headaches and to keep taking the prescribed pain medication.

---

[2]     Drexler's medical records provide a timeline of his complaints and symptoms.  Medical records may be admissible as business records if they are properly authenticated.  (See *Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 742.)  Although both sides submitted unauthenticated portions of Drexler's medical records in connection with the motion for summary judgment, neither side objected.  (See § 437c, subd. (b)(5) ["[e]videntiary objections not made at the hearing shall be deemed waived"]; *Collin v. Calportland Co.* (2014) 228 Cal.App.4th 582, 599, fn. 5 [hearsay, authentication, and relevance objections to documents are forfeited if not raised in summary judgment papers or at the hearing].)

In November 2007 Drexler returned yet again to Dr. Petersen, complaining of daily headaches that began with occipital (back of the head) pain. He told Dr. Petersen the headaches improved with massage and physical therapy. Dr. Petersen ordered more pain medication and referred Drexler to physical therapy.

In November 2009 members of Drexler's family called Dr. Petersen and informed him they were taking Drexler to the emergency room because Drexler's head and neck pain was so severe he could not lift his arms. The family members also told Dr. Petersen that they wanted Drexler to have a magnetic resonance imaging study (MRI) "of the muscle" and that Drexler "knows it is a muscle." Dr. Petersen explained that an MRI "is not useful for muscle pain." Dr. Petersen later spoke with Drexler and noted that the "pain remain[ed] occipital and in the trapezius distribution to the shoulder," and that Drexler's statement "'Can't move shoulders' means his muscles hurt, not that he has neuro weakness." Dr. Petersen continued to prescribe pain medication and physical therapy, advised Drexler to continue seeing a chiropractor, and added acupuncture to Drexler's treatment. In response to Drexler's statement "I need an MRI," Dr. Petersen wrote, "Answer: MRI is a diagnostic tool most used by surgeons contemplating surgery. He has palpable tender muscle spasms. His headache is completely relieved when these resolve. The MRI will not add to his diagnosis. . . ."

A few months later, on January 30, 2010, Drexler returned to Petersen for "neck pain." Dr. Petersen's records reflect that Drexler reported, "It's a muscle," while pointing to his trapezius. When Drexler asked why he felt pain in the back of his head if the problem was in his trapezius muscle, Dr. Petersen "explained

4

the attachments again and how neck muscle tension classically causes pain in the occiput." Drexler also reported that he was experiencing pain radiating down his right arm and numbness in his fourth and fifth fingers, although Drexler could not remember when he started experiencing the tingling in his hands. Dr. Petersen reported: "Pain is muscular, reproducible with palpation of trapezius muscle and neck movement, does not involve the head other than occiput, so an MRI of his head is not indicated. He wants an MRI of his trapezius, but that is not likely to reveal anything that would alter the treatment." Dr. Petersen prescribed continued use of pain medication and referred Drexler to "pain management." In addition, because Drexler "complain[ed] of intermittent para[e]sthesia [tingling in extremities] in right ulnar nerve distribution, and since he [was] convinced he need[ed] an MRI, [Dr. Petersen] defer[red] to neurology in this regard."

On February 10, 2010 Drexler consulted Dr. German, a neurologist, for "headaches" and "right arm tingling." Drexler told Dr. German that the tingling in his fingers and pain in his right arm began four or five years earlier when he "suffered some trauma to the arm while attempting to change a tire," and that a subsequent car accident caused additional injury to the arm. Dr. German diagnosed Drexler with carpal tunnel syndrome as a "likely explanation for shoulder pain and par[a]esthesia" and a "tension-type headache" probably resulting from "medication overuse." Dr. German prescribed various medications for pain and inflammation and advised him to wear wrist splints at night for six to eight weeks.

On March 3, 2010 Dr. German performed an "NCS/EMG" (electromyogram nerve conduction study), an electrical test of

nerves and muscles to identify the source of the tingling. Dr. German diagnosed Drexler with "ulnar nerve entrapment at elbow" and advised him to "stop putting pressure on his elbows." Dr. German explained to Drexler that the problem with his elbow was separate from his headaches, the pain medication was for the headaches, and if he did not want to take the medication he should follow up with his primary care physician.

On May 20, 2010 Drexler called Dr. Petersen about "severe headaches" he had been suffering "off and on" for three years and complained he was "not getting the treatment that he should be getting." Drexler again reported pain in his trapezius, occiput, and shoulder, and again stated he thought it was muscular. Dr. Petersen told him to take the pain medications and referred him to a pain management specialist, Dr. Imad Rasool.

On October 22, 2010 Drexler returned to Dr. Petersen with the same neck pain and occipital headache. The medical records state, "Same exaggerated urgency to the problem, stating how much it affects his life, how it is nearly impossible to function, how he can't sleep or go out socially." Dr. Petersen continued to diagnose a "tension-type headache" and "cervicalgia" (neck pain). Dr. Petersen gave Drexler an injection of pain medicine, referred him to pain management, and "explained again that more diagnostic tests [were] not needed."

On January 15, 2011 Drexler consulted with Dr. Petersen for the last time. Dr. Petersen saw Drexler as a "hallway consult," and Drexler reported that "he finally used the referral to pain management, and his pain [was] greatly improved." The medical records indicate that Dr. Rasool conducted an MRI of Drexler's neck and diagnosed him with "multi-level disk disease," which Dr. Petersen noted was "common in many necks and often

seen incidentally on MRI." Dr. Petersen noted that Drexler should continue with Dr. Rasool for musculoskeletal neck pain and follow up with Dr. Petersen as needed.

During the time Drexler treated with Dr. Petersen, and briefly treated with Dr. German, he did not seek any other medical treatment. Drexler testified at his deposition, however, that he never believed that his headaches were due to tension and stress, or that a problem with the muscles in his neck or shoulders caused the headaches. Drexler testified that, after the first few visits, he did not think Dr. Petersen properly diagnosed his headaches, he thought Dr. German's diagnosis of carpal tunnel syndrome was "a joke," and at no time was he ever satisfied with the medical treatment he received from Dr. Petersen or Dr. German. He testified that he nevertheless continued to trust Dr. Petersen: "I trusted Dr. Petersen knew what he was talking about. Then when we got the second opinion by Dr. German, a neurologist, and then to see Dr. Rasool, I thought I was being taken care of . . . ." Yet Drexler was sufficiently dissatisfied with his treatment by Dr. Petersen that on January 15, 2011, the day of the "hallway" consultation, Drexler obtained his medical records so he could consult with an attorney about whether he could sue Dr. Petersen for malpractice. The attorney told Drexler "he didn't think [Drexler] had a case."[3] Drexler did not see another primary care physician until the fall of 2012.

_____

[3] Drexler changed this deposition testimony to state that he asked for his medical records "in hopes of finding a new doctor that could diagnose the problem," and that "[i]t wasn't until after surgery [in 2013] and going [through] hell that [he] considered suing for medical malpractice." Citing *Wagner v. Glendale*

7

B.    *Drexler's Symptoms Become More Severe, and He Ultimately Learns He Has a Brain Tumor*

In October 2012 Drexler went to Olive View Medical Center complaining of headaches and diplopia (double vision). Doctors there scheduled an MRI of Drexler's brain, but Drexler did not stay for the procedure because he felt the line was too long. Drexler subsequently saw an optometrist, who prescribed glasses, but the glasses did not improve his double vision.

In late January 2013 Drexler went back to Olive View Medical Center complaining of a "new onset of unsteady gait," "progressive voice hoarseness," and "dysphagia" (difficulty swallowing) over the last three months. Doctors conducted an MRI of Drexler's brain and discovered "a very large meningioma" (brain tumor). The tumor was impinging on Drexler's brain stem and causing "focal neurologic defects of cranial nerves," which "likely account[ed] for [Drexler's] [diplopia], dysphagia, dysphonia [difficulty in speaking], and ataxia [gait abnormality]." Doctors recommended Drexler have emergency surgery. On January 31, 2013 doctors removed the tumor, which caused Drexler serious injuries.

C.    *The Court's Summary Judgment Ruling*

On July 30, 2013 Drexler filed this action, alleging that Dr. Petersen and Dr. German negligently failed to diagnose, and delayed the diagnosis of, his brain tumor. The trial court granted the defendants' motion for summary judgment on the grounds

---

*Adventist Medical Center* (1989) 216 Cal.App.3d 1379, 1391-1392, the trial court stated, "The court rejects the changed testimony as it contradicts [Drexler's] first admission against interest[, which] is 'valued so highly.'" Drexler does not appeal this ruling.

8

that both the one-year and the three-year limitations periods in section 340.5 barred Drexler's claim. The court ruled that the one-year statute of limitations barred Drexler's medical malpractice claim against Dr. Petersen because Drexler had a suspicion of wrongdoing by January 15, 2011, when he ordered his medical records and consulted an attorney. The court ruled the one-year limitations period also barred his claim against Dr. German because the court found that Drexler had a suspicion of wrongdoing as early as March 2010, when Dr. German diagnosed him with carpal tunnel syndrome. The court also ruled that the three-year statute of limitations period barred Drexler's claim against Dr. German because Drexler suffered an injury in March 2010, when Dr. German failed to diagnose Drexler's brain tumor. Finally, the court ruled that HealthCare Partners was entitled to summary judgment because no claims remained against Dr. Petersen or Dr. German. Drexler timely appealed.

## DISCUSSION

### A. *Standard of Review and General Law*

"We review the trial court's grant of summary judgment de novo and decide independently whether the parties have met their respective burdens and whether facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1484; see *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618.) ""We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence

9

in favor of that party.""" (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

"A defendant has the initial burden to show that undisputed facts support summary judgment based on the application of an affirmative defense." (*Trovato v. Beckman Coulter, Inc.* (2011) 192 Cal.App.4th 319, 322; see *Melendrez v. Ameron Internat. Corp.* (2015) 240 Cal.App.4th 632, 637-638.) "The statute of limitations operates in an action as an affirmative defense." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 396.) "'[T]he question of when there has been a belated discovery of the cause of action, especially in malpractice cases, is essentially a question of fact,'" and "'[i]t is only where reasonable minds can draw but one conclusion from the evidence that the question becomes a matter of law.'" (*Brown v. Bleiberg* (1982) 32 Cal.3d 426, 436; accord, *Whitfield v. Roth* (1974) 10 Cal.3d 874, 886; see *Bispo v. Burton* (1978) 82 Cal.App.3d 824, 831 [reversing summary judgment because of a factual issue regarding when the patient suffered injury within the meaning of the medical malpractice statute of limitations]; cf. *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 ["[w]hile resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper"].)

B.    *The Statute of Limitations Does Not Bar Drexler's Malpractice Claim as a Matter of Law*

Section 340.5 provides:  "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action

10

shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." A plaintiff in a medical malpractice action must satisfy the requirements of both the one-year and the three-year limitations periods. (*Brown v. Bleiberg, supra,* 32 Cal.3d at pp. 436-437; *Doe v. Doe 1* (2012) 208 Cal.App.4th 1185, 1192; *Artal v. Allen* (2003) 111 Cal.App.4th 273, 278.) The injury commences both the three-year and the one-year limitations periods. (See *Larcher v. Wanless* (1976) 18 Cal.3d 646, 650 ["the meaning of the word 'injury' as used in the statute . . . designate[s] the event which starts the running of the overall four-year [now three-year] limitation period, and the discovery of which is the basis of the shorter one-year limitation"].)[4] The one-year limitations period, however, does not begin to run until the plaintiff discovers both his or her injury and its negligent cause. (See *Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 896 ["the term 'injury,' as used in section 340.5, means both a person's physical condition *and* its 'negligent cause'"]; *Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 99 ["the word 'injury' had come to be used in the cases to denote both a person's physical condition *and* its 'negligent cause'"].) "[T]he word 'injury' [has] the same meaning in the parallel [now three]-year and one-year limitation periods of the statute." (*Larcher v. Wanless, supra,* 18 Cal.3d at p. 658, fn. 14; accord, *Bispo v. Burton, supra*, 82 Cal.App.3d at p. 827, fn. 1; see *Wells Fargo Bank v. Superior Court* (1977) 74 Cal.App.3d 890, 899, fn.

---

[4] In 1975 the Legislature amended section 340.5 "to shorten the outer limitations period from four years to three." (*Flores v. Presbyterian Intercommunity Hosp.* (2016) 63 Cal.4th 75, 81; see *Larcher v. Wanless, supra*, 18 Cal.3d at p. 650, fn. 1.)

11

9 [the California Supreme Court has stated that "'injury' had the same meaning in relation to both the one- and the four-year limitations" under former section 340.5]; see also *Gilloon v. Humana Inc.* (Nev. 1984) 687 P.2d 80, 81, fn. 4 ["[i]t is to be presumed that the Legislature intended the term 'injury' to have the same meaning in the parallel two-year and four-year limitation periods" in Nevada's medical malpractice statute].)

As noted, the trial court ruled that Drexler, having consulted an attorney in January 2011 to determine whether he could sue Dr. Petersen and Dr. German for malpractice, had a "suspicion of wrongdoing" by that time. The fact that Drexler contemplated suing Dr. Petersen and Dr. German is strong evidence that Drexler suspected the doctors had not properly diagnosed or treated his headaches. (See *Gutierrez v. Mofid, supra,* 39 Cal.3d at p. 897 [facts that the plaintiff knew of her injury almost immediately after the operation and consulted a lawyer because she wanted to explore her legal remedies constituted constructive notice of her claim].) Even with the presence of such suspicions, however, the one-year and three-year limitations periods did not begin to run until Drexler discovered his injury—that is, became aware of additional, appreciable harm from his preexisting condition—and, with respect to the one-year limitations period, also had reason to believe that injury was caused by the wrongdoing of Dr. Peterson and Dr. German.

In most cases, the plaintiff discovers his or her injury prior to, or contemporaneously with, learning its negligent cause. As a result, "[w]ith regard to the one-year limitation provision, the issue on appeal usually is whether the plaintiff actually suspected, or a reasonable person would have suspected, that the injury was caused by wrongdoing." (*Garabet v. Superior Court*

12

(2007) 151 Cal.App.4th 1538, 1545.)  The issue in this appeal, however, is not whether Drexler had actual or constructive knowledge of the doctors' alleged wrongdoing, but when Drexler discovered his injury.

### 1.    *The Definition of Injury Under Section 340.5*

The word "injury" in section 340.5 "refer[s] to the damaging effect of the alleged wrongful act and not to the act itself." (*Larcher v. Wanless, supra*, 18 Cal.3d at p. 656, fn. 11.) Therefore, "[t]he date of injury could be much later than the date of the wrongful act where the plaintiff suffers no physical harm until months or years after the wrongful act." (*Steketee v. Lintz, Williams & Rothberg* (1985) 38 Cal.3d 46, 54.)  The injury, however, is not necessarily the ultimate harm suffered, but instead occurs at "the point at which 'appreciable harm' is first manifested." (*Brown v. Bleiberg, supra,* 32 Cal.3d at p. 437, fn. 8; see *Hills v. Aronsohn* (1984) 152 Cal.App.3d 753, 762 (*Hills*) ["appreciable harm" may become apparent before the ultimate harm or diagnosis].)  "Each case necessarily will turn on its own particular circumstance.  It could well be that an injury or pathology will not manifest itself for some period after the last treatment by a physician.  On the other hand, that injury or pathology may manifest itself and the patient will suffer known appreciable harm at a time prior to the 'ultimate' result." (*Bispo v. Burton*, *supra*, 82 Cal.App.3d at p. 831; see *Warren v. Schecter* (1997) 57 Cal.App.4th 1189, 1203 [statute of limitations runs from "point at which appreciable harm was first manifested[, and] '[m]anifested' is that point at which the damage has become evidenced in some significant fashion; when the damage has clearly surfaced and is noticeable"]; *McNall v. Summers* (1994) 25

Cal.App.4th 1300, 1309 [statute of limitations begins to run when there is "appreciable harm or the point in time at which appreciable harm is first manifested"]; *Marriage & Family Center v. Superior Court* (1991) 228 Cal.App.3d 1647, 1652 ["[t]he word 'manifest' as used by our courts indeed suggests not only actual damage but that the damage has made itself known in some outward fashion"].)

In many medical malpractice cases, the patient alleges that the health care provider has performed a procedure that caused some injury. In such cases, it is relatively easy to determine when both the injury and its cause occurred, whether the injury occurs immediately following the procedure or does not manifest itself until months or even years later. (See, e.g., *Garabet v. Superior Court*, *supra*, 151 Cal.App.4th at p. 1541 [plaintiff suffered cloudy vision, dryness in his eyes, and double vision within weeks of having LASIK surgery]; *McNall v. Summers*, *supra*, 25 Cal.App.4th at p. 1310 [plaintiff suffered memory loss soon after receiving electroconvulsive therapy]; *Rose v. Fife* (1989) 207 Cal.App.3d 760, 769 [plaintiff discovered injury from insertion of defective intrauterine device when she suffered pelvic infection many years later].)

When a patient experiences appreciable harm before the ultimate harm, that appreciable harm will start the limitations period. For example, in *Hills*, *supra*, 152 Cal.App.3d 753, the plaintiff received silicone injections in her breasts from the defendant doctor in 1966. (*Id*. at p. 756.) In 1974, when the plaintiff noticed lumps and soreness, she consulted a second doctor who informed her that the lumps were "typical" after silicone injections. (*Ibid*.) In April 1975 a third doctor informed the plaintiff that she was suffering from "silicone granulomatosis

14

due to silicone injections" and discussed the possibility of surgery to remove the silicone lumps. (*Ibid.*) Almost two years later, on January 6, 1977, the third doctor noted that the plaintiff "feels that the lump in her right breast has gotten larger and also, that her breasts have become more uncomfortable . . . ." (*Id.* at pp. 756-757.) That doctor recommended both a mastectomy and breast reconstruction, and the plaintiff had surgery on February 28 and March 4, 1977. (*Id.* at p. 757.) On March 1, 1978 the plaintiff filed a malpractice suit against the defendant. (*Ibid.*) Affirming summary judgment for the defendant doctor, this court rejected the defendant's argument that the injury occurred on the date of the negligent act in 1966, when the defendant injected the silicone, and also rejected the plaintiff's argument that the injury did not occur until the mastectomy in 1977. (*Id.* at p. 762.) Instead, this court held that the key event was the soreness and lumps the plaintiff experienced in 1974, four years before she filed her lawsuit. (*Ibid.*) This court explained: "This admission is sufficient to show that she suffered the damaging effect of the alleged malpractice on that date [in 1974]." (*Id.* at pp. 762-763; see *Bispo v. Burton, supra,* 82 Cal.App.3d at p. 831 [rejecting the defendant's argument that the injury occurred on date of the hip surgery, rejecting the plaintiff's argument that the injury occurred four years later upon learning that leg amputation was necessary, and finding there was a factual issue regarding when the plaintiff suffered injury].)

> 2. *Injury in a Case of Failure To Diagnose a Preexisting, Latent Condition*

When a plaintiff brings a malpractice action based on the defendant's failure to diagnose, or misdiagnosis of, a latent,

15

progressive condition, identification of the "injury" is more difficult. (See *Raddatz v. U.S.* (9th Cir. 1984) 750 F.2d 791, 796 ["[w]hen a claim of malpractice is based on a failure to diagnose, warn, or treat a patient for a pre-existing injury, rather than affirmative conduct creating a new injury, 'identification of both the injury and its cause may be more difficult for a patient'"].) Only one published case in California addresses the issue of when a plaintiff suffers appreciable harm in the context of misdiagnosis of a preexisting, hidden condition. In *Steingart v. White* (1988) 198 Cal.App.3d 406 (*Steingart*) the plaintiff noticed a lump in her breast, and in February 1982 the defendant doctor diagnosed the lump as fibrocystic disease, a benign condition. (*Id.* at p. 409.) The plaintiff believed the lump was "very nodule and hard," and she "had a feeling of cognitive dissonance" about the diagnosis. (*Id.* at p. 410.) Because she had "some question in [her] mind" about the diagnosis, she made an appointment with a second doctor a few months later. The second doctor ordered a mammogram, which was negative for cancer. (*Ibid.*) The negative result reassured the plaintiff that she did not have cancer. (*Ibid.*) In 1984 the plaintiff went to a third doctor, who ordered another mammogram. Again the results were negative. (*Ibid.*) In April 1985 the plaintiff "noticed a change in the contour of the upper outer quadrant of her right breast." (*Ibid.*) The third doctor immediately referred the plaintiff to a fourth doctor, who performed a lumpectomy and informed the plaintiff that she had Stage II breast cancer. (*Ibid.*)

On March 24, 1986, more than four years after the defendant doctor's examination, but within one year of the change in contour of the breast and the cancer diagnosis, the plaintiff filed a malpractice action. (*Steingart, supra,* 198

16

Cal.App.3d at p. 410.) The court, reversing an order granting the defendant's motion for summary judgment on statute of limitations grounds, rejected the defendant's argument that the plaintiff "suffered an injury—cancer as manifested by the lump— at the time [the first doctor] examined her on February 12, 1982." (*Id*. at p. 414.) Instead, the court determined that the plaintiff "suffered no damaging [effect] or appreciable harm from [the defendant doctor's] asserted neglect until [the third doctor] discovered her cancer in April 1985." (*Ibid*.) The court rejected the defendant's argument that the plaintiff's lump, which she knew about in 1982, was like the lump and soreness in *Hills*, which had commenced the running of the statute of limitations. (*Id*. at p. 415.) The court's holding recognized the difference between a plaintiff who can connect her injury to a prior negligent procedure, and a plaintiff whose injury predates consultation with a doctor: "[A]lthough [the plaintiff] knew about the lump at the time [the defendant] examined her, such a condition is not a clear indication of injury, either damaging effect or appreciable harm. Unlike [the plaintiff in *Hills*], the plaintiff [in *Steingart*] was not advised the lump was the result of any earlier treatment [the silicone injections]. On the contrary, she was told repeatedly the lump was nonthreatening." (*Ibid*.)

There are federal cases under the Federal Tort Claims Act (FTCA) addressing the issue of when a medical malpractice plaintiff discovers an injury after a doctor's failure to diagnose a preexisting, hidden condition. (See 28 U.S.C. § 2401(b)).[5] For

---

[5] Title 28 United States Code section 2401(b) provides: "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate federal agency

17

example, in *Augustine v. U.S.* (9th Cir. 1983) 704 F.2d 1074 (*Augustine*) the court recognized the difficulty a patient may have in identifying both the injury and its cause when a doctor fails to diagnose or treat a preexisting condition:  "Where a claim of medical malpractice is based on the failure to diagnose or treat a pre-existing condition, the injury is not the mere undetected existence of the medical problem at the time the physician failed to diagnose or treat the patient or the mere continuance of that same undiagnosed problem in substantially the same state. Rather, the injury is the *development* of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment."  (*Id.* at p. 1078.)  The court in *Augustine* held, "In this type of case, it is only when the patient becomes aware or through the exercise of reasonable diligence should have become aware of the development of a pre-existing problem into a more serious condition that his cause of action can be said to have accrued for purposes of [28 U.S.C.] section 2401(b)."  (*Ibid*.; see *Mamea v. U.S.* (D. Hawai'i 2010) 2010 WL 3384854, at p. 8 [plaintiff discovered her injury "when she learned that her previously diagnosed condition, kidney stones, had deteriorated into a more serious condition, acute renal failure"]; *Neuenswander v. U.S.* (D.Vt. 2006) 422 F.Supp.2d

within two years after such claim accrues . . . ."  Like a medical malpractice claim under section 340.5, a medical malpractice claim "accrues" under the FTCA when a plaintiff "discovers both the existence and cause of his injury."  (28 U.S.C. § 2401(b); see *United States v. Kubrick* (1979) 444 U.S. 111, 113, 119-122; *McGraw v. U.S.* (9th Cir. 2002) 281 F.3d 997, 1001, amended by (9th Cir. 2002) 298 F.3d 754.)

18

425, 434 [plaintiff's injury for purposes of 28 U.S.C. § 2401(b) was "the deterioration of his medical condition"].)

In *McGraw v. U.S.* (9th Cir. 2002) 281 F.3d 997, amended by (9th Cir. 2002) 298 F.3d 754 (*McGraw*), the Ninth Circuit refined this standard to explain that a claim will not accrue until the plaintiff knows that his worsening health is related to a preexisting condition. The court in *McGraw* held that "an FTCA plaintiff asserting a failure-to-diagnose claim must know or have reason to know of a pre-existing condition before the accrual clock begins to run." (*Id.* at p. 1001.) Thus, in addition to "the mere knowledge of a worsening medical condition," the plaintiff also "must know or have reason to know of a pre-existing condition before the accrual clock begins to run. Otherwise, it would be virtually impossible for a plaintiff to assert such a theory when the doctor's negligence is perhaps most wanton: a failure to inform the patient about the existence of a condition that should be treated immediately or monitored vigilantly in the future." (*Id.* at p. 1003.)[6]

We conclude that a standard similar to the standard articulated in *Augustine* and *McGraw* should apply to section 340.5 for claims involving failure to diagnose or treat a preexisting condition. As the court in *Augustine* explained, the plaintiff in such a case may discover the injury when the

---

[6] Other federal courts have stated or applied the *Augustine* rule in failure-to-diagnose cases. (See, e.g., *Outman v. U.S.* (9th Cir. 1989) 890 F.2d 1050, 1052-1053); *Rosales v. U.S.* (9th Cir. 1987) 824 F.2d 799, 804; *Raddatz v. U.S.*, *supra*, 750 F.2d at p. 796; *Green v. U.S.* (7th Cir. 1985) 765 F.2d 105, 108-109; *Mamea v. U.S.*, *supra*, 2010 WL 3384854, at p. 8; *Toro v. U.S.* (D. Hawai'i 2003) 287 F.Supp.2d 1235, 1240.)

undiagnosed condition develops into a more serious condition, but before it causes the ultimate harm.  (See *Augustine*, *supra*, 704 F.2d at pp. 1078-1079.)  With the worsening of the plaintiff's condition, or an increase in or appearance of significant new symptoms, the plaintiff with a preexisting condition either actually (subjectively) discovers, or reasonably (objectively) should be aware of, the physical manifestation of his or her injury.  (See *Goldrich v. Natural Y Surgical Specialties, Inc.* (1994) 25 Cal.App.4th 772, 780-782 [although the plaintiff believed her body's rejection of breast implants, and not the actual implants, were causing her medical problems, a reasonable person would have had suspicions about the implants]; *Marriage & Family Center v. Superior Court*, *supra*, 228 Cal.App.3d at p. 1654 [although "[w]e accept the *Steingart* proposition that severe damage which does not show itself (hidden cancer, for instance) is not 'injury' until it is found by diagnosis," it "does not follow . . . that damage which has clearly surfaced and is noticeable is not 'injury' until either the plaintiff or her physician recognizes it"].)  And consistent with the court's decision in *Steingart*, whether measured subjectively or objectively, when a plaintiff discovers that a preexisting condition has developed into a more serious condition is often a factual issue.  (See *Steingart, supra*, 198 Cal.App.3d at p. 416 ["there remains at minimum a triable issue of fact as to whether Steingart exercised reasonable diligence after the purported misdiagnosis," and "[r]easonable minds could easily conclude Steingart did everything within her power to ascertain what, if any, illnesses she had after receiving [the] initial diagnosis"]; *Augustine,* at p. 1079 [whether dentists had advised the plaintiff in 1975 that a bump on his palate required further diagnosis and

care prior to another doctor's cancer diagnosis in 1977 was a factual issue]; *McGraw v. U.S., supra*, 281 F.3d at p. 1004 [when the decedent became aware that terminal lung cancer may have resulted from earlier misdiagnosis of a lung condition was a factual issue].)

### 3. *When Drexler Became Aware of His Injury Is a Factual Issue*

In their motion for summary judgment, Dr. Petersen and Dr. German argued that Drexler suffered appreciable harm "throughout the time that he sought care and treatment from Dr. Petersen and Dr. German" because he continued to suffer severe and debilitating headaches. Dr. Petersen and Dr. German did not argue that Drexler's symptoms ever increased or his condition ever became worse. They relied exclusively on the fact that Drexler's headaches continued without any improvement. In contrast, Drexler argued in opposition to the motion that his injury, like the plaintiff's injury in *Steingart*, did not manifest until doctors correctly diagnosed his brain tumor on January 28, 2013.[7]

---

[7] The trial court's findings regarding when Drexler discovered his injury for purposes of section 340.5 are unclear. The court stated: "The undisputed evidence establishes that the limitations period has expired as against Dr. German since the alleged failure to diagnose occurred on 3/3/10 . . . ." Distinguishing *Steingart*, the court further concluded: "Plaintiff's testimony indicates he continued to suffer intense headaches throughout treatment with [Dr. Petersen and Dr. German]. Plaintiff admits that by October 2012, his symptoms worsened, he had double vision, progressive hoarseness, inability to balance and had persistent headaches." The court's reliance on the

21

The parties have modified their positions on appeal. Dr. Petersen and Dr. German now argue that Drexler suffered appreciable harm under section 340.5 not when his headaches continued unabated for several years, but when Drexler's headaches became worse and he suffered "neurological deficits, including shoulder pain, arm pain, arm tingling, finger tingling and numbness," which they argue was as early as March 2010 but no later than January 2011. Conversely, Drexler now concedes that his increased symptoms in October 2012, which included double vision, hoarseness, difficulty swallowing, and balance problems, may have been sufficient to commence the one-year limitations period. The evidence in the record is on Drexler's side.

The evidence Dr. Petersen and Dr. German submitted in support of their motion for summary judgment of a pre-October 2012 increase in symptomatology, including Drexler's deposition

October 2012 date is probably a typographical error because if Drexler's injury first manifested in October 2012 his July 2013 lawsuit would have been timely. To the extent the trial court ruled that Drexler suffered appreciable harm upon Dr. German's failure to diagnose his tumor, or that the continuation of Drexler's preexisting headaches "throughout treatment with" Dr. Petersen and Dr. German constituted appreciable harm, the court's ruling was incorrect. (See *Steingart, supra*, 198 Cal.App.3d at p. 416 [rejecting the argument that injury manifests upon initial misdiagnosis]; *Augustine, supra,* 704 F.2d at p. 1078 [where the medical malpractice claim is based on failure to diagnose a preexisting condition, the injury is not the mere continuance of that same undiagnosed problem in substantially the same state].)

testimony and the medical records, does not support the arguments they make on appeal.  There is no evidence that Drexler's headaches became worse or "more intense."  In fact, Dr. Petersen's records reflect that Drexler's headaches were not getting worse, but were "chronic," "intermittent," and lasted for four years.  The medical records state that, as of October 22, 2010, Drexler reported the "same c/o [complaints of] neck pain and occipital headache" and the "same exaggerated urgency to the problem, stating how much it affects his life, how it is nearly impossible to function, how he can't sleep or go out socially."

There is also no evidence that prior to October 2012 Drexler's shoulder pain, neck pain, and "neurological deficits" were related to his headaches or signs of a brain tumor.  The evidence of Drexler's arm and finger tingling, which he first reported to Dr. Petersen on January 30, 2010, does not show or support an inference that those symptoms were related to his headaches or indicative of a brain tumor.  Drexler stated he could not recall when the tingling started, but he told Dr. German he thought they "started 4-5 years ago" after "he suffered some trauma to the arm while attempting to change a tire."  Dr. German told Drexler that the tingling in Drexler's arm and fingers was unrelated to his headaches, and Dr. German's March 2010 medical records reflect that the carpal tunnel syndrome affecting Drexler's arm had nothing to do with his headaches.  Nor do the medical records state or support an inference that Drexler's neck and shoulder pain were new symptoms.  Drexler complained of neck and shoulder pain in January 2007, November 2009, and throughout 2010, and he repeatedly requested an MRI of his shoulder.  And Dr. Petersen concluded

23

that the pain in Drexler's trapezius muscle did "not involve the head other than [the] occiput."

At a minimum, Dr. Rasool's diagnosis of Drexler's neck pain as "multi-level disk disease" and Drexler's reported improvement under Dr. Rasool's care create a triable issue of material fact regarding whether Drexler's neck pain was related to his preexisting condition, and therefore whether it constituted the appreciable harm that would commence the statute of limitations. (See *McGraw v. U.S., supra,* 281 F.3d at p. 1001 [in light of the plaintiff's overall poor physical condition, including back pain, congestion, and coughing, it was unclear from the record whether the plaintiff should have discovered that lung cancer was the result of an earlier failure to diagnose a lung condition].) Therefore, because the evidence was not undisputed that Drexler discovered his injury more than one year before he filed this action, Dr. Petersen and Dr. German were not entitled to summary judgment under section 340.5. (See *Mason v. Marriage & Family Center* (1991) 228 Cal.App.3d 537, 543 [reversing summary judgment where "nothing in the record [established] the date of [the plaintiff's] injury as a matter of law"]; *Bispo v. Burton, supra*, 82 Cal.App.3d at p. 831 [the defendant's evidence was "insufficient to effectively negate the existence of the triable issue of fact respecting the crucial element of injury and consequently cannot provide an adequate basis for summary judgment"]; see also *Augustine, supra*, 704 F.2d at p. 1079 [district court should not have dismissed the plaintiff's malpractice claim unless the relevant facts relating to date of the plaintiff's discovery of his injury were not in dispute].)

Dr. Petersen and Dr. German may yet prevail on their statute of limitations defense; they are just not entitled to prevail

24

on summary judgment.  For example, although Drexler concedes that he suffered appreciable harm by October 2012 when his condition worsened and he experienced new symptoms of double vision and unsteady gait, nothing in the record indicates what symptoms, if any, Drexler experienced between January 2011, when he stopped treating with Dr. Petersen, and October 2012.  His symptoms may have increased during that period, but there is no evidence in the record that they did.  Nor is there any evidence that during this period Drexler consulted with any other health care professional who told him that he needed an MRI because his symptoms, although constant, had persisted for too long.  (See *Steingart, supra,* 198 Cal.App.3d at p. 416; *Augustine, supra*, 704 F.2d at p. 1078.)  In the absence of such evidence, whether Drexler actually discovered, or reasonably should have discovered, his injury more than a year before he filed his malpractice claim remains a factual issue for trial.  (See *Photias v. Doerfler* (1996) 45 Cal.App.4th 1014, 1021 [reversing summary judgment because the record did not conclusively show when injury became evident and "express[ing] no opinion on when the injury first manifested itself, leaving the question for resolution in the trial court"]; *Bispo v. Burton*, *supra*, 82 Cal.App.3d at p. 831 [the defendant's "statements viewed most advantageously are insufficient to effectively negate the existence of the triable issue of fact respecting the crucial element of injury and consequently cannot provide an adequate basis for summary judgment"].)

## DISPOSITION

The judgment is reversed.  Drexler is to recover his costs on appeal.


SEGAL, J.

We concur:


PERLUSS, P. J.


GARNETT, J. [*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.