Filed 7/28/21  Zwierlein v. IV Solutions CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROBERT F. ZWIERLEIN, | |
| Plaintiff and Appellant, | G058093 |
| v. | (Super. Ct. No. 30-2012-00579320) |
| IV SOLUTIONS, INC., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, John C. Gastelum, Judge.  Affirmed.

J. Scott Humphrey, for Plaintiff and Appellant.

Horton, Oberrecht & Kirkpatrick, Cheryl A. Kirkpatrick and Fang Li for Defendant and Respondent IV Solutions, Inc.

Greer & Associates, C. Keith Greer and C. Tyler Greer for Defendant and Respondent Devon Glazer.

\*          \*          \*

Plaintiff Robert F. Zwierlein appeals from a judgment in favor of defendants, IV Solutions, Inc. and Dr. Devon Glazer (collectively defendants). The trial court dismissed Zwierlein's complaint against defendants with prejudice, after concluding his claims were time-barred under Code of Civil Procedure section 340.5 (section 340.5). Zwierlein contends the evidence was insufficient to establish he was aware of the physical cause and negligent cause of his symptoms prior to March 24, 2011. As discussed below, we conclude the trial evidence established Zwierlein discovered or should have discovered with the use of reasonable diligence his medical malpractice claims against respondents before March 24, 2011. Accordingly, we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

On June 22, 2012, Zwierlein filed a complaint against defendants for medical malpractice. Following several amendments, the operative complaint alleged that in December 2010, Dr. Glazer prescribed the antibiotic Gentamicin intravenously to treat an infection in Zwierlein's left heel. IV Solutions administered the antibiotic and monitored its effects. In January 2011, Zwierlein began "experiencing trouble getting out of bed and felt imbalanced." He also developed trouble with his eyesight. Over the next several months, Zwierlein saw numerous medical personnel, but "[n]one of the doctors diagnosed the symptomatology as being caused by Gentamicin poisoning." Finally on March 23, 2011, Zwierlein saw Dr. Robert Baloh, who subsequently diagnosed him with "'vestibular loss secondary to Gentamicin toxicity.'" The complaint alleged that Zwierlein's receipt of Baloh's written diagnosis "some time after March 23, 2011, was Plaintiff's first notice that any doctor had concluded that Gentamicin toxicity was possibly causing his balance problem." Later testing confirmed Baloh's diagnosis.

2

"Plaintiff thereafter investigated the cause of Gentamicin [intravenous] ototoxicity and then first learned of the dangerous side effects of the drug."

The complaint asserted that Gentamicin is an aggressive antibiotic which is known to produce side effects when used for periods greater than three to four days. "[A]lthough standard protocol requires that after a very short period of use . . . the patient should be carefully monitored and evaluated by an infectious disease physician, no such careful monitoring or referral was done, nor was the drug discontinued or replaced with a less toxic antibiotic. Instead, the medication was administered in heavy doses for a period in excess of thirty days." As a result, Zwierlein suffered and continues to suffer symptoms of vertigo, problems with his vision, and loss of balance.

In defendants' separate answers to the operative complaint, they asserted as an affirmative defense, the applicable statutes of limitations, including section 340.5. Defendants also filed separate but similar motions for summary judgment. The summary judgment motions argued the undisputed facts established Zwierlein was on notice of his malpractice claims by March 23, 2011, if not earlier, and thus, his claims were barred by the applicable statute of limitations. The trial court denied the motions, concluding the evidence presented did not show Zwierlein was explicitly told the use of Gentamicin in his case was abnormal or negligent, and there was no evidence Zwierlein was aware of the negligent cause of his injury.

The trial court conducted a three-day bench trial on the statute of limitations defense in July 2018. Following trial, the court issued a 12-page statement of decision and judgment. In the written statement, the trial court found the following facts.

For some time, Zwierlein required and received medical treatment for various conditions, including type 2 diabetes, morbid obesity, and diabetic vasculopathy. On December 6, 2010, Zwierlein was admitted to Saddleback Memorial Hospital for left foot pain. Dr. Glazer ordered intravenous administration of an antibiotic, Gentamicin, to treat an infection in Zwierlein's left foot. Pursuant to that prescription, Zwierlein

3

received intravenous administration of Gentamicin from admission to the hospital through discharge, December 13, 2010.

On December 12, 2010, Dr. Glazer prescribed an additional seven day course of Gentamicin to commence following discharge. IV Solutions filled the prescription for Gentamicin, covering the period December 13, 2010, through December 22, 2010. Per plan, a home health nurse was to administer the drug intravenously. Zwierlein received his first in-home dose of Gentamicin from Home Health Nurse Kathy Winteringham, on December 13, 2010. He testified that Winteringham did not discuss the potential risks of Gentamicin use with him, except perhaps as to kidney issues. He also claimed the box containing the drug was missing an insert listing the potential risks of Gentamicin use. According to Zwierlein, he would not have taken Gentamicin had he known of the potential side effects associated with its use.

At a postoperative appointment on December 22, 2010, Zwierlein complained of hearing problems and ringing in his ears. At that time, Dr. Glazer told Zwierlein that ototoxicity was a known risk of Gentamicin use, and the hearing/ringing in the ear issues he was having could be related to Zwierlein's use of this drug. Glazer indicated he felt Zwierlein did not need to be on the drug, but Zwierlein should see an infectious disease doctor. Glazer then ordered the administration of additional rounds of Gentamicin.

Following Dr. Glazer's advice, Zwierlein visited infectious disease specialist, Alan White, M.D., on January 4, 2011. At that visit, White discussed the potential side-effects of Gentamicin. White expressed his inclination for Zwierlein to discontinue further use, noting the risks of continued use outweighed the benefits. Two days later, on January 6, 2011, Zwierlein ceased Gentamicin use. Shortly thereafter, on January 7 and 10, 2011, Zwierlein complained of dizziness.

On January 8, 2011, Winteringham visited Zwierlein's home to draw his blood due to his complaint of severe dizziness and her concern that Zwierlein could have

4

a high Gentamicin level. She testified she was drawing blood to make sure that the level of the medication was not causing damage to either his kidneys or his ears, and to ensure that this information was not being hidden from him. She testified "'[t]hat was clearly stated'" to plaintiff. Winteringham further noted in the records and testified that she "'instructed [Zwierlein regarding the] pathophysiology [of] dizziness and vertigo'" and explained "'[h]ow people get dizzy, what dizziness is about, that essentially vertigo happens in the inner ear.'"

Zwierlein's primary care physician examined him on January 11, 2011. At that time, Zwierlein reported he had experienced dizziness, ear ringing, and imbalance issues in the days immediately preceding the examination.

On February 7, 2011, Zwierlein appeared at the South Bay Hearing and Balance Center for an appointment. In response to a questionnaire posing the following questions: "'Do you know of any possible cause of your dizziness? If yes, what might the cause be?'" Zwierlein wrote: "'Antibiotics.'" The medical records relating to this visit show the examining physician noted Zwierlein's dizziness was "'likely the result of his taking Gentamicin, which is known to be ototoxic.'"

On March 9, 2011, Zwierlein presented to Neuro-Ophthalmologist, Peter Quiros, M.D., and reported the reason for his visit was "'dizziness [sic], possible side effects from Gentamicin.'" Zwierlein further reported that he thought his dizziness "'started at the end of taking Gentamicin.'" Quiros advised Zwierlein that he "'appear[ed] to have bilateral vestibulopathy which may have been triggered by the gentamycin use.'" Quiros also informed Zwierlein that Gentamicin is well known for causing vestibular dysfunction/disorders, like ototoxicity. Quiros referred Zwierlein to the Neuro-Otology Center at UCLA for further evaluation and treatment.

On March 23, 2011, Zwierlein visited neurologist, Robert Baloh, M.D. Baloh noted Zwierlein presented to him for evaluation of chronic dizziness and imbalance, following a course of Gentamicin. Following his examination of Zwierlein,

5

Baloh noted and discussed with Zwierlein – per his custom and practice – his assessment that "'almost certainly'" Zwierlein's dizziness was caused by Gentamicin ototoxicity, and further discussed that Gentamicin can be ototoxic.

On April 7, 2011, Zwierlein underwent testing which confirmed the information Dr. Baloh communicated to Zwierlein on March 23, 2011. On March 21, 2012, Zwierlein served notice of his intention to commence litigation and, on June 22, 2012, Zwierlein filed his complaint.

Zwierlein testified he did some Internet research in April 2012, and it was then that he first discovered Gentamicin to be a "black label" medication, i.e., it was a dangerous drug. He found a Web site called "Wobblers.com," which detailed "'people's experience with Gentamicin ototoxicity'" and "'the dose being too high.'" Zwierlein believed he had seen that Web site before March 23, 2011, but "'I didn't really investigate it.'" He also agreed that he could have done the research after seeing Dr. Quiros "'on March 9, 2011 when he knew dizziness was a possible side effect of Gentamicin, or on March 23, . . . after his visit with Baloh. . . . However, when asked if there was any reason that he could not do the same research prior to March 23, . . . Plaintiff responded, "there was nothing[.]  Other than [*sic*] physically trying to live[.]  Yes, I could have done it, but I didn't."'"

Based on the foregoing facts, the trial court concluded "credible evidence showed Plaintiff knew the factual cause of his injury and was aware of sufficient facts to put him on inquiry notice of the negligent cause of his injury on multiple occasions, i.e., by (1) December 22, 2010; (2) January 7, 2011; (3) February 7, 2011; (4) March 9, 2011; and, at the latest, (5) March 23, 2011. Accordingly, when Plaintiff filed his complaint on June 22, 2012, Plaintiff's cause of action for professional negligence was barred by the applicable statute of limitations." The trial court granted judgment in favor of defendants, and ordered the complaint dismissed with prejudice.

6

Section 340.5 provides: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." Under the discovery rule, the statute of limitations begins to run when a plaintiff suspects or should suspect that her injury was caused by wrongdoing. "[T]he limitations period begins once the plaintiff ""'has notice or information of circumstances to put a reasonable person on inquiry . . . .'"" [Citation.] A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110-1111 (*Jolly*).)

"[R]esolution of the statute of limitations issue is normally a question of fact." (*Jolly*, *supra*, 44 Cal.3d at p. 1112; see *Drexler v. Petersen* (2016) 4 Cal.App.5th 1181, 1197 ["[W]hether Drexler actually discovered, or reasonably should have discovered, his injury more than a year before he filed his malpractice claim remains a factual issue for trial"].) Because a bench trial was held on the statute of limitations issue, on appeal the question becomes whether there was substantial evidence to support the trial court's findings on the issue. "In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment [citation]. All issues of credibility are likewise within the province of the trier of fact. [Citation.] 'In brief, the appellate court ordinarily *looks only at the evidence*

7

*supporting the successful party, and disregards the contrary showing*.' [Citation.] All conflicts, therefore, must be resolved in favor of the respondent." (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925-926.)

Here, the evidence presented at the bench trial established Zwierlein was on inquiry notice of his claims against Dr. Glazer and IV Solutions more than one year before he filed his intention to commence litigation. Although substantial evidence supports the trial court's conclusion Zwierlein was on inquiry notice on any one of five dates, we focus on March 9, 2011, when Zwierlein met with Dr. Quiros.

By at least January 7, 2011, Zwierlein was experiencing symptoms of Gentamicin poisoning. When he met Dr. Quiros, Zwierlein reported the reason for his March 9, 2011, visit was "'dizziness [*sic*], possible side effects from Gentamicin.'" Zwierlein further reported that he thought his dizziness "started at the end of taking Gentamicin." Quiros advised Zwierlein that he "'appear[ed] to have bilateral vestibulopathy which may have been triggered by the gentamycin use.'" Quiros also informed Zwierlein that Gentamicin is well known for causing vestibular dysfunction/disorders, like ototoxicity. Zwierlein testified he conducted an Internet search and from a Web site learned of other "'people's experience with Gentamicin ototoxicity'" and "'the dose being too high.'" Zwierlein believed he had seen that Web site before March 23, 2011, and acknowledged he could have done the research after seeing Quiros on March 9, 2011, when he knew dizziness was a possible side effect of Gentamicin. The preceding facts show that by March 9, 2011, Zwierlein discovered or should have discovered through the use of reasonable diligence that an inappropriate prescription of Gentamicin was the likely cause of his symptoms. By that date, the evidence established that not only did Zwierlein suspect that Gentamicin use was the likely physical cause of his symptoms, but also that he discovered or could have discovered with reasonable diligence that the *inappropriate* Gentamicin prescription was the negligent cause of his symptoms.

Zwierlein's reliance on *Artal v. Allen* (2003) 111 Cal.App.4th 273 (*Artal*), is misplaced.  There, the plaintiff suffered severe throat pain following a diagnostic laparoscopy.  (*Id*. at pp. 275-276.)  After consulting numerous medical specialists, she underwent exploratory surgery which revealed a thyroid cartilage fracture, a condition the plaintiff attributed to the intubation by the defendant anesthesiologist.  (*Id.* at p. 277.)  The trial court concluded the claim was time-barred because during a May 6, 1999, visit with a pain specialist, the plaintiff reported that the cause of her throat pain was possibly "'*some sort of trauma . . . caused during intubation*.'"  (*Id.* at p. 280.)  The appellate court reversed, finding that the May 6, 1999 response merely showed the plaintiff suspected a connection between her throat pain and the intubation, not that the throat pain was caused by professional negligence.  "That evidence did not materialize until the exploratory surgery on November 5, 1999, which revealed the thyroid cartilage fracture." (*Id.* at pp. 280-281.)  The appellate court also noted the plaintiff had consulted numerous specialists, and was provided with dozen of diagnoses.  "None of these diagnoses implicated Dr. Allen [the defendant anesthesiologist]."  (*Id*. at p. 281.)  *Artal* is distinguishable because there, exploratory surgery was required to establish the cause of the plaintiff's severe throat pain.  In the present case, Dr. Quiros diagnosed Zwierlein's symptoms as likely caused by Gentamicin use.  At that time, Zwierlein was aware of the Gentamicin prescription and had been informed of the side effects of Gentamicin use.  In addition, Zwierlein testified that a simple Internet search revealed that high doses of Gentamicin could result in his symptoms.  Our review of the record reveals substantial evidence supports the trial court's conclusion that Zwierlein discovered or should have discovered his medical malpractice claims against Dr. Glazer and IV Solutions more than one year before he filed his intention to commence litigation.  Accordingly, the trial court did not err in dismissing the operative complaint with prejudice and granting judgment in favor of defendants.

9

III

DISPOSITION

The judgment is affirmed.  Defendants are entitled to their costs on appeal.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.