[No. B031622. Second Dist., Div. Three. Jan. 12, 1989.]

POLLY ROSE, Plaintiff and Appellant, v.
J. KINGSLEY FIFE, Defendant and Respondent.

[No. B037041. Second Dist., Div. Three. Jan. 12, 1989.]

G. D. SEARLE & CO., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
POLLY ROSE, Real Party in Interest.

COUNSEL

Ronald M. Cohen and Barry Rotner for Plaintiff and Appellant and Real Party in Interest.

Wood, Lucksinger & Epstein and Mardi J. Boss for Defendant and Respondent.

Sidley & Austin, Winchester Cooley III, Hugh C. Gardner III, Jack Oswald and Carmen R. Toledo for Petitioner.

No appearance for Respondent.

OPINION

**CROSKEY, J.**—In this matter we have, on our motion, consolidated the appeal of plaintiff, Polly Rose, with the petition for writ of mandate filed by defendant G.D. Searle & Co. (Searle). This case arose from injuries which plaintiff alleges she sustained by her use of an intrauterine device (IUD) called the "Copper 7." Searle manufactures the Copper 7. Defendant Doctor J. Kingsley Fife (Fife) prescribed and inserted the Copper 7 for plaintiff. Both defendants filed motions for summary judgment in which they contended plaintiff's suit was barred by the statute of limitations. The trial court granted Fife's motion but denied Searle's. We conclude that all of plaintiff's causes of action are barred by the statute of limitations and therefore each defendant is entitled to summary judgment.

### PROCEDURAL BACKGROUND

Plaintiff filed her suit against Searle and Fife on February 4, 1986, alleging causes of action against "defendants, and each of them" for products

liability, negligence, breach of implied and express warranties and medical malpractice.[1]

Searle answered the complaint on March 12, 1986, and asserted as an affirmative defense that plaintiff's suit was barred by the statute of limitations. Fife filed a demurrer on July 9, 1987, also asserting the statute of limitations. Before the demurrer could be heard, plaintiff filed, on July 30, 1987, a motion for leave to amend her complaint. The trial court granted plaintiff's motion and the defendants each filed an answer to the first amended complaint. Thereafter, in September 1987 both defendants filed motions for summary judgment, contending plaintiff's action against them was untimely, Fife citing Code of Civil Procedure section 340.5 and Searle citing section 340, subdivision (3).[2] Plaintiff filed opposition to the motions.

On October 30, 1987, the trial court granted both motions. Later, on its own motion, the court reconsidered defendants' motions, allowing the parties time to submit supplemental points and authorities and instructing them to consider *Kensinger* v. *Abbott Laboratories* (1985) 171 Cal.App.3d 376 [217 Cal.Rptr. 313]. Thereafter on November 20, 1987, the trial court granted summary judgment to Fife. It denied Searle's motion, citing a then pending Supreme Court case, subsequently filed as *Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103 [245 Cal.Rptr. 658, 751 P.2d 923], as grounds for so doing. Plaintiff filed an appeal from that portion of the order granting Fife's motion.[3]

Searle filed another motion for summary judgment on July 7, 1988. ■■■■ The trial court denied this motion on August 12 and Searle filed its petition for writ of mandate on September 12.[4] Because they involve

---

[1] Plaintiff also alleged violation of Civil Code section 3294 as a cause of action. However, the provisions of section 3294 do not provide for a separate cause of action but rather for a particular type of recovery to be prayed for when the defendant's acts have amounted to oppression, fraud, malice or homicide.

[2] Unless otherwise indicated, all statutory references herein are to the Code of Civil Procedure.

[3] An appeal may be taken from a summary judgment. (§ 437c, subd. (1).) The order granting the motion for summary judgment is not itself appealable. However, we will treat the portion of the order appealed from as a judgment against plaintiff and construe her notice of appeal as applying to that judgment, thereby allowing consideration of the merits of plaintiff's appeal. (*Dover* v. *Sadowinski* (1983) 147 Cal.App.3d 113, 115 [194 Cal.Rptr. 866]; *Tong* v. *Jocson* (1977) 76 Cal.App.3d 603, 604 [142 Cal.Rptr. 726].) Under section 579, a judgment can be rendered against one or more of several defendants, leaving the action to proceed against the others. (*Tinsley* v. *Palo Alto Unified School Dist.* (1979) 91 Cal.App.3d 871, 880 [154 Cal.Rptr. 591].)

[4] "A writ of mandate is a proper remedy to compel a trial court to grant a motion for summary judgment where the affidavits in support of the moving party are sufficient to sustain a judgment in his favor, and his opponent does not by counteraffidavit show facts sufficient to

essentially identical issues we have ordered Searle's petition consolidated with plaintiff's appeal for resolution in a single opinion.

## FACTUAL BACKGROUND

Dr. Fife inserted a Copper 7 into plaintiff in October 1978. He told her to have it replaced in three years and he replaced it in January 1982 with another Copper 7. In her complaint, plaintiff alleged that at the time the Copper 7 was placed in her it was defective and unreasonably dangerous for its intended use because it increased the rate of accidental pregnancies, septic abortions, inflammations, masses, sterility and problems associated with the Fallopian tubes. Plaintiff alleged she "neither knew nor had reason to know at the time of her purchase and acquisition of said Copper 7 or at any time prior to August 18, 1984, of the existence of the foregoing described defect." Plaintiff alleged that as a proximate result of her use of the Copper 7 she suffered severe permanent internal injuries which have and will necessitate medical attention and loss of wages.

After defendants asserted statute of limitation defenses in their respective answer and demurrer, plaintiff moved for leave to amend her complaint. In a declaration, dated July 27, 1987, and submitted in support of that motion, plaintiff stated that in August 1984 she watched a broadcast of the television show "60 Minutes" in which defects of another intrauterine device (the Dalkon Shield) were discussed. She then contacted her attorney, Ronald Cohen, related to him the information from the broadcast and told him she believed she had worn the Dalkon Shield. Cohen later contacted her and told her she had worn a Copper 7.

Plaintiff then states in her declaration: "Therefore, at that time, I had no knowledge that the Copper 7 was believed to have caused a number of physical injuries to its users. [¶] However, on or about October 5, 1985, I read an article in the Chicago Tribune which linked the Copper 7 to a number of injuries to women. It was only at this time that I learned that my injuries may have been caused by my use of the Copper 7 device. [¶] Therefore although I was aware that one type of IUD was linked to certain injuries in women in August, 1984, *I was not aware that my specific IUD could possibly have caused my problems until October of 1985.*" (Italics added.)

Attorney Cohen also submitted a declaration in support of plaintiff's motion for leave to amend. In it he states that after he got plaintiff's medical

present a triable issue of fact. [Citations.]" (*Roman Catholic Archbishop* v. *Superior Court* (1971) 15 Cal.App.3d 405, 410 [93 Cal.Rptr. 338].)

records to determine if she had worn a Dalkon Shield, her file lay dormant until she contacted him after reading the newspaper article on the Copper 7. Cohen states: "It was this newspaper article that put Plaintiff on notice that her physical injuries were the result of the Defendant's IUD." He also states: "Thus, Paragraph 7 of the complaint herein is mistaken in that [plaintiff] was aware of defects in the Dalkon Shield devices [in August of 1984] but not that of Defendant's Copper 7."

Cohen contends his own actions support plaintiff's assertion that it was the newspaper article which caused her to be aware of the Copper 7's defects. He points to the fact that within one month after the newspaper article was published he sent a section 364 notice to Fife and he filed the instant action as soon as that 90-day notice to Fife had run. He then states: ". . . the complaint therefore should have alleged that Plaintiff first learned of Defendant's possible negligence on October 5, 1985, as alleged in the First Amended Complaint, not as alleged in Paragraph 7 of the Complaint, or August 18, 1984." Cohen also requested "that the Complaint be amended so as to more clearly name defendant FIFE as a Defendant in each cause of action." Plaintiff's complaint was amended to allege she neither knew nor had reason to know prior to October 5, 1985, of the existence of defects in the Copper 7.

Defendants' motions for summary judgment were based in part on plaintiff's deposition taken in May 1987. In her deposition, plaintiff stated that in March 1983 she was hospitalized with a pelvic infection. Both the emergency room doctor and the staff doctor who treated her after she was admitted (Dr. Parks) told her the IUD had to be removed because of the infection. Both doctors told her they felt the IUD was the cause of the infection. At that time or the week thereafter, Dr. Parks told plaintiff that she was "no doubt sterile" because of her high fever and infection. The Copper 7 was removed during her hospitalization after the infection and swelling subsided. Plaintiff has never been pregnant.

Plaintiff testified that at the time of her hospitalization, because of what the doctors told her, she believed the IUD was the cause of her infection and pain. Prior to her hospitalization, plaintiff had heard and or read that the Copper 7 could cause infections. Also, she had voiced her concerns to Fife a year before the infection, inquiring whether the IUD should be used by someone who has not had children.[5] After she left the hospital, she saw Fife and informed him of the infection and the removal of the IUD. When asked if she told Fife that she thought the Copper 7 had caused the

---

[5] The newspaper article which plaintiff read in October 1985 states in part: "Litigation concerning the Copper 7 . . . centers on whether Searle adequately warned women who had not had children that the IUD could cause pelvic infection that might lead to infertility."

infection, plaintiff answered: "I don't know that I said it. I figured he would know what I was saying without actually—and I felt kind of intimidated by it or embarrassed, because here was the man that gave it to me."

Plaintiff testified she had not reviewed her complaint. Defendant's counsel read to her the language in paragraph 7 of the complaint regarding the August 18, 1984, date and then asked plaintiff what she had learned on or about that date. Plaintiff answered that the date did not have any significance for her. She stated: ". . . I knew the [Copper 7] was bad before [August 18, 1984] because of the experience that I had. And prior to that I thought I knew that IUD's [sic] weren't all that safe from what I had read and seen and heard . . . ."

On July 15, 1986, Searle propounded a second set of interrogatories to plaintiff. Interrogatory 91 states: "Please state in complete detail each and every fact you learned on or about August 18, 1984, relating to the existence of any defects in the [Copper 7] as alleged in paragraph 7 of the complaint." Plaintiff's answer to interrogatory 91 states: "I learned that the [Copper 7] was in fact unsafe and my case was not an isolated incident. I heard this through the news media, but I can't remember exactly where."

## ISSUES ON APPEAL

The issue presented in plaintiff's appeal and Searle's petition is the same: when did the statute of limitations begin to run on plaintiff's several causes of action.

## DISCUSSION

### 1. Causes of Action Against Fife for Medical Malpractice and Negligence [6]

The relevant statute of limitations for actions against health care providers, section 340.5,[7] contains two periods of limitation—a three-year

---

[6] Plaintiff's cause of action for medical malpractice alleges Fife "negligently examined and diagnosed plaintiff . . . so as to fail to detect inflammation, masses, fibrous tissues, and other diseases associated with the pelvic area, and so negligently treated and cared for plaintiff, that plaintiff sustained injury and aggravation to said pelvic area so as to proximately cause the hereinafter alleged damages." The cause of action for negligence alleges: "The Copper 7 was produced, distributed, supplied, marketed and tested by the defendants, and each of them, in a negligent manner and the defendants, and each of them, negligently failed to warn and educate the general public concerning the dangerous and untested nature of [the Copper 7] so that members of the general public could intelligently determine whether or not they should use said device as an optional form of contraception." All of Fife's alleged wrongful acts in these two causes of action stem from actions taken in his capacity as plaintiff's doctor and therefore come within the terms of section 340.5.

[7] Section 340.5 provides in pertinent part: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the com-

period and a one-year period, both of which must be met. (*Steingart* v. *Oliver* (1988) 198 Cal.App.3d 406, 412 [243 Cal.Rptr. 678]; *Hills* v. *Aronsohn* (1984) 152 Cal.App.3d 753, 757-758 [199 Cal.Rptr. 816].) The three-year period begins to run when the plaintiff discovers the harmful effect, i.e., the physical manifestation of the wrongful act. The negligent cause of that effect is not a concern for the three-year period. (*Hills, supra,* at pp. 760, 762.)

In the instant case, plaintiff experienced the effects of Fife's alleged wrongful acts in March 1983 when she was hospitalized. Her complaint was filed in February 1986. Therefore, plaintiff met the three-year period of limitations.

The one-year period, however, was not met by plaintiff. The one-year period commences when the plaintiff is aware of both the physical manifestation of the injury and *its negligent cause.* (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1109;[8] *Gutierrez* v. *Mofid* (1985) 39 Cal.3d 892, 896 [218 Cal.Rptr. 313, 705 P.2d 886]; *Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 99 [132 Cal.Rptr. 657, 553 P.2d 1129]; *Steingart* v. *Oliver, supra,* 198 Cal.App.3d at p. 415; *Hills* v. *Aronsohn, supra,* 152 Cal.App.3d at p. 759.)

Our Supreme Court has often discussed the one-year rule's requirement of discovery of the negligent cause of injury. When a plaintiff has information which would put a reasonable person on inquiry, when a plaintiff's "reasonably founded suspicions [have been] aroused" and the plaintiff has "become alerted to the necessity for investigation and pursuit of her remedies," the one-year period commences. "Possession of 'presumptive' as well as 'actual' knowledge will commence the running of the statute." (*Sanchez* v. *South Hoover Hospital, supra,* 18 Cal.3d at pp. 101-102; accord *Jolly* v. *Eli Lilly & Co., supra,* 46 Cal.3d at pp. 1110-1111; *Gutierrez* v. *Mofid, supra,* 39 Cal.3d at pp. 896-897.)[9] The plaintiff's ignorance of the identity of the

---

mencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person."

[8] The *Jolly* court rejected the contention that the one-year period commences when the plaintiff is aware of her injury and its *factual* cause. (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1109, fn. 4.)

[9] Although *Jolly* was a products liability case and the statute of limitations for such a cause of action is found in section 340, subdivision (3), the same rules regarding discovery of one's

defendant wrongdoer does not toll the one-year period. (*Jolly, supra,* at p. 1114; *Gutierrez, supra,* at p. 899.)

"Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. . . . A plaintiff need not be aware of the specific 'facts' necessary to *establish* the claim [such as failure to test, failure to warn, failure to diagnose]; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; *she cannot wait for the facts to find her.*" (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at pp. 1110-1111, italics added.)

 Here, plaintiff testified at her deposition that at the time of her hospitalization, two doctors told her the infection was caused by the IUD. Plaintiff also testified that at the time of her hospitalization she had already heard on the news or read in the papers that the Copper 7 caused infections. She stated that at that time, she knew the Copper 7 could cause infections and because of this knowledge she had earlier specifically asked Fife whether it should be used by women who have not had children. Thus, the evidence shows that at that time, the injury had manifested itself and plaintiff had "reasonably founded suspicions" that she had been harmed by Fife's prescribed use of the Copper 7.

In her brief on appeal, plaintiff contends that the defense attorney's use of the term "CU-7" (Copper 7) throughout her deposition was interpreted by her as merely a generic reference to IUD's. Thus, when he questioned her about what she knew of the CU-7 at the time of her hospitalization, she believed he really meant what she knew about IUD's in general. She points to her declaration to show that it was not until her attorney got her medical records, which was well after her hospitalization, that she knew she had been using a Copper 7.[10] This contention, however, strengthens Fife's case because it shows that at the time of her hospitalization plaintiff had a general mistrust and suspicion about IUD's per se and about their use by

---

cause of action apply. *Jolly* based its holding on the rules set out in section 340.5 cases, such as *Sanchez* and *Gutierrez. Jolly* also cited a case based on a fraud cause of action, *Miller* v. *Bechtel Corp.* (1983) 33 Cal.3d 868 [191 Cal.Rptr. 619, 663 P.2d 177]. (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at pp. 1110-1111.)

[10] The case can also be made that even if plaintiff was not, and should not have been, suspicious of wrongdoing in March 1983, then in August 1984 she should have been. It was then she saw the "60 Minutes" broadcast. If she thought the defects in the Dalkon Shield had relevance to her, (and she apparently did since she consulted an attorney after seeing the broadcast), she reasonably should have also thought that the Copper 7 might also have such defects or others which had affected her and caused her hospitalization.

women who had not had children. Thus, if at the time of her hospitalization, plaintiff did not *truly* suspect that her injury was caused by Fife's wrongfully prescribing an IUD for her, she reasonably *should have* suspected wrongdoing. We hold as a matter of law that a reasonable person would have suspected wrongdoing by Fife and would have inquired; she would have gone to find the facts rather than waiting until October 1985 for the facts to come to her. (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at pp. 1110-1111.)

Further, as noted above, plaintiff did not need to know the identity of the manufacturer of the IUD in order to file her action. She knew the identity of the person who prescribed the IUD and she could have timely sued him, naming the manufacturer as a Doe defendant. (44 Cal.3d at p. 1118.) Nor did she need to know all the facts which prove fault before filing her action. It is pretrial discovery which brings out the specifics of wrongdoing, i.e., the facts to establish a plaintiff's case. (*Id.,* at p. 1111.)

■ Although generally the reasonability of a plaintiff's "belated discovery" is a question of fact, where reasonable minds can draw only one conclusion from the evidence, the question becomes one of law. In that case, summary judgment based on the statute of limitations is proper. (*Id.,* at p. 1112; *Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 665 [150 Cal.Rptr. 384, 12 A.L.R.4th 27].) ■ Here, there is but one conclusion to be drawn from the evidence: plaintiff's knowledge and suspicions at the time of her hospitalization regarding the use of IUD's caused the one-year period of limitations to commence. Therefore her causes of action against Fife for negligence and medical malpractice were time-barred.

## 2. *Causes of Action Against Searle for Negligence and Against Searle and Fife for Products Liability*

■ Suits for personal injury based on a products liability cause of action come under section 340, subdivision (3).[11] (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at pp. 1108, 1109; *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 25 [122 Cal.Rptr. 218].) Subdivision (3) of section 340 provides for a one-year statute of limitations. As with suits for medical malpractice, the "discovery rule" applies. The one-year statute of limitations begins to run when the plaintiff is aware of her injury and its negligent cause. (*Jolly, supra,* 44 Cal.3d at p. 1109.) The plaintiff is held to both her actual and presumptive knowledge. The one-year period begins to run when she has notice or information that would make a reasonable person inquire;

---

[11] Section 340 provides in pertinent part: "Within one year: [¶] . . . [¶] (3) An action for . . . injury to . . . [a person] caused by the wrongful act or neglect of another . . . ."

and it begins to run when she has the opportunity to obtain knowledge through investigation of sources open to her. (*Id.,* at pp. 1109, 1110-1111; *Sanchez* v. *South Hoover Hospital, supra,* 18 Cal.3d at p. 101.)

The Supreme Court in *Jolly* made it clear that the one-year period begins to run when the plaintiff *suspects or should suspect* that her injury was caused by wrongdoing, i.e., that *someone* had done something wrong to her. It does not commence running, as the court in *Kensinger* v. *Abbott Laboratories* (1985) 171 Cal.App.3d 376 [217 Cal.Rptr. 313] had held, when the plaintiff *knows* or with reasonable diligence *should know* of *facts which constitute the wrongful conduct.* (*Id.,* at pp. 384-385, 386.)

The difference between *Kensinger* and *Jolly* lies in the plaintiff's state of mind. *Kensinger* held the statute does not start to run until the plaintiff knows of (1) the injury, (2) its cause and (3) the factual basis for a legal remedy, i.e., facts which establish the wrongdoing of a particular defendant or defendants, such as failure to adequately test the product or to warn of its hazards. (*Kensinger* v. *Abbott Laboratories, supra,* 171 Cal.App.3d at pp. 383-385.) While acknowledging that other jurisdictions have adopted rules similar to those set out in *Kensinger,* the Supreme Court in *Jolly* specifically rejected the *Kensinger* analysis, saying that it "goes too far." (*Jolly* v. *Eli Lilly & Co., supra,* 44 Cal.3d at p. 1110.)

As with cases of alleged medical malpractice, even though the issue of when the plaintiff discovered or should have discovered her injury and its negligent cause is usually one for the trier of fact, "where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper. [Citation.]" (44 Cal.3d at p. 1112.)

Again, we find the facts of this case permit only one legitimate inference: plaintiff suspected or should have suspected that the manufacturer (Searle) and the prescriber (Fife) of her IUD wronged her by supplying her with a defective product. As discussed above, plaintiff's deposition testimony shows that at the time of her hospitalization she was already suspicious of IUD's per se and worried about using one without having had children. She had been alerted to the dangers of IUD's by the media. By the time her fears hit home, she certainly had the notice and information to put her on inquiry, to make her suspicious of wrongdoing.

This case is similar to *Jolly,* where the court began its opinion by stating; "This case presents the following questions: whether a plaintiff, in a suit for personal injury caused by a defective drug, who is unaware of any specific facts establishing wrongful conduct on the part of any drug manufacturer, may delay bringing an action until she discovers such facts . . . ." The

*Jolly* case concerned a drug, DES, which was taken by plaintiff's mother to prevent miscarriage. The drug is linked to cancer in the daughters of mothers who have taken it. Plaintiff learned in 1972 that her mother had taken DES and that she (plaintiff) could suffer injuries because of that. Plaintiff was diagnosed as having a precancerous condition that required careful monitoring and several years later, in 1978, she underwent a complete hysterectomy and a partial vaginectomy. Plaintiff was not able to determine who manufactured the drug which her mother took because her mother's medical records were unavailable and DES had been manufactured by hundreds of pharmaceutical companies.

The *Jolly* court stated: "Although [plaintiff] believed that DES had caused her injuries and that those who marketed DES had wrongfully marketed a defective product, there is no conclusive evidence in the record to show that a reasonable investigation by plaintiff in 1978 would have disclosed specific proven facts that would establish any wrongful conduct on the part of a DES drug manufacturer." (44 Cal.3d at p. 1108). Jolly filed her action in 1981, several years after she first learned about the dangers of DES and almost one year after the Supreme Court in *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061] held that a DES plaintiff who could not identify the manufacturer that made the drug her mother ingested, could nonetheless state a cause of action by joining as defendants the companies who manufactured a substantial percentage of the market share of DES. The evidence showed that as early as 1978 Jolly felt DES was a defective drug. The court held she had slept on her rights since 1978 and her action was time-barred.

### 3. Causes of Action Against Fife and Searle for Breach of Implied and Express Warranties

Causes of action for breach of express and implied warranties in suits based on personal injuries are governed by the statute of limitations prescribed in section 340, subdivision (3). (*Becker* v. *Volkswagen of America, Inc.* (1975) 52 Cal.App.3d 794, 802 [125 Cal.Rptr. 326]; 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 408, pp. 436-437.) Therefore, plaintiff's causes of action for breach of warranty, like her other causes of action, are time-barred.

### DISPOSITION

The order granting defendant Fife's motion for summary judgment is affirmed. Let a peremptory writ of mandate issue directing respondent superior court to vacate its August 12, 1988, order denying Searle's motion

for summary judgment, to grant said motion and to enter a judgment in favor of Searle and Fife. Costs on appeal to defendant Fife.

Klein, P. J., and Arabian, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 29, 1989.