Filed 4/8/22  Altraide v. Eyolfson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| STELLA ALTRAIDE, | C093549 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2018-00233326-CU-MM-GDS) |
| v. | |
| MICHAEL EYOLFSON et al., | |
| Defendants and Respondents. | |

This case arises out of decedent's treatment for prostate cancer at a Kaiser medical facility.  Decedent died in May 2015, and this action was filed in May 2018 against various Kaiser entities,[1] decedent's primary care physician, and three additional doctors and a nurse who were involved in his cancer treatment.  In 2019, decedent's wife, their children, and their daughter-in-law filed the operative complaint, which added three

---

[1] These entities include Kaiser Foundation Health Plan, Inc., The Permanente Medical Group, Inc., and Kaiser Foundation Hospitals.

1

pharmaceutical companies and two additional nurses as defendants. The pharmaceutical defendants included the two companies that allegedly manufactured Lupron, and a third company that allegedly manufactured Effexor.

This is the second appeal in this case. In the first appeal, we affirmed the judgments entered after the trial court granted a motion by the non-pharmaceutical defendants to strike the punitive damages allegations and sustained various demurrers to the operative complaint, including the demurrers to all claims brought by decedent's children and daughter-in-law, and the demurrers to all claims that were brought against the pharmaceutical companies and other defendants added in 2019. (*Altraide v. Pfizer, Inc.* (May 2021, C091318) [nonpub. opn.].)

In this appeal, decedent's wife, proceeding as a self-represented litigant, appeals from the judgments entered after the trial court granted summary judgment in favor of decedent's primary care physician and urologist as to the wife's remaining fraud claims. The trial court determined that each of the fraud claims was either a claim for medical malpractice or wrongful death and barred by the applicable statute of limitations and also that summary judgment was warranted on the merits. We shall affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

We forego a detailed recitation of the background of this multi-defendant case. Instead, we summarize the relevant facts and proceedings.

*Factual Background*

The following facts are taken from the evidence set forth in the papers filed in connection with the summary judgment motions, except that to which objections were properly made and sustained. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 (*Yanowitz*).) We summarize the evidence in the light most favorable to the party

2

opposing summary judgment, in this case decedent's wife, Stella Altraide,[2] resolving any doubts concerning the evidence in her favor. (*Ibid*.)

In 2012, Kaiser was decedent's health care provider. In early October 2012, decedent was seen by his primary care physician, Joseph Buchanan, D.O. Decedent, who was 77 years old, complained of frequent urination and reported that he had been told by a doctor in the past that he had an enlarged prostate and a high prostate-specific antigen (PSA) level. After a physical examination, Dr. Buchanan determined that decedent had an enlarged prostate and ordered laboratory tests, including a PSA test. Dr. Buchanan's initial assessment was that decedent was suffering from dysuria (painful urination). After reviewing the test results, Dr. Buchanan referred decedent to a urologist due to his "significantly elevated PSA" level.

Several days later, a urologist, Michael Eyolfson, M.D., recommended a biopsy, which was performed in early November 2012. The biopsy revealed that decedent had prostate cancer, which was disclosed to him around a week later. During that visit, Dr. Eyolfson spent more than 15 minutes counseling decedent and one of his daughters on issues related to his cancer diagnosis, including answering all of their questions. Two days later, a "whole body bone scan" was performed, which did not reveal "definite evidence for osseous metastatic disease."

In early December 2012, Dr. Eyolfson referred decedent to the radiation and oncology department and decided to treat him with hormone therapy; specifically, Lupron injections every 16 weeks for two years. The first injection was administered that day. During this visit, Dr. Eyolfson spent more than 20 minutes counseling decedent and Stella on issues related to his cancer treatment, including Lupron injections. Two weeks later, decedent was seen by a doctor in the radiation and oncology department. He

---

[2] Because most of plaintiffs in this action share the same last name, we refer to each plaintiff by their first name after the first reference to avoid any confusion.

complained of increased urinary frequency at night and "some bony aches" in his right shoulder and right knee. After a physical examination, the doctor counseled decedent and one of his daughters about the options for managing his "high-risk" prostate cancer, including hormone therapy, surgery, or external-beam radiation therapy in conjunction with hormone therapy. Following a detailed discussion of the possible acute and long-term side effects of radiation therapy, decedent verbalized his understanding of the potential complications and agreed to proceed with treatment.

In early 2013, decedent received radiation therapy, which included the placement of gold seeds within his prostate after he gave written consent to the procedure. In late February 2013, decedent was prescribed the medication Effexor to treat his hot and cold flashes, which are a side effect of Lupron.

In early March 2013, decedent notified Dr. Eyolfson that he would be traveling to Nigeria in May and that he planned on returning to the United States in January 2014. In response, Dr. Eyolfson advised decedent to find a urologist in Nigeria to continue his cancer treatment, including Lupron injections and PSA tests. In late March 2013, decedent received a second Lupron injection and Dr. Eyolfson reminded him to find a urologist in Nigeria. Radiation treatment was completed less than two weeks later.

In May 2013, decedent called the urology clinic and asked whether the pain he was experiencing in his shoulders and knees was caused by Lupron. He explained that the pain began after the most recent Lupron injection and had progressed from mild to severe. Thereafter, a nurse spoke with one of decedent's daughter's (Nkem Ayeni-Aarons) and indicated that he did not "think" Lupron was causing decedent's pain but advised Nkem that decedent should be seen by his primary care physician if the pain continued.

Over the course of the next two years, Nkem made a number of phone calls to the urology clinic related to decedent's health and cancer treatment. In July 2013, she reported that decedent had left the country with no definite plan of returning and would

4

receive future medical care in Nigeria.  In September 2013, she reported that decedent was no longer experiencing pain in his shoulder and had no other complaints, except for hot and cold flashes.  In February 2014, she notified a nurse that decedent's hot flashes were unbearable and indicated that he may have received one or more doses of Lupron while in Nigeria.  In response, the nurse told Nkem that the "lingering effects" of Lupron could be causing decedent's hot flashes, and that he should be seen by a doctor if his condition did not improve.  In April 2015, Nkem reported that decedent's lab work was abnormal and he was "having difficulty taking anything in."  Dr. Eyolfson advised Nkem that decedent should contact the urology clinic upon returning to the United States.

In May 2015, Nkem and decedent's son (Ibibia Altraide) notified Dr. Eyolfson that decedent was very ill and needed blood transfusions due to a bone marrow problem. In response, Dr. Eyolfson recommended that decedent see a urologist and advised them that a hematologist was the appropriate specialist for bone marrow problems.  During this conversation, Nkem mentioned that decedent had received a third Lupron injection in August 2013.  Decedent died a week later in Nigeria.  The primary cause of death was cardiorespiratory failure; the secondary cause was bone marrow suppression.

*Procedural Background*

In March 2016, Stella sent Kaiser a notice of her intent to file a medical malpractice action against it under Code of Civil Procedure section 364.[3]  The notice explained that the legal basis for the action was incompetent care, including the failure to provide decedent pertinent information about his cancer treatment, resulting in a lack of informed consent for the treatment he received.[4]

---

[3] Further undesignated statutory references are to the Code of Civil Procedure.

[4] Section 364 precludes a plaintiff from filing a professional negligence action against a health care provider unless the plaintiff has given the health care provider 90 days' notice "of the intention to commence the action."  (§ 364, subd. (a).)  "No particular form of

5

In May 2016, Stella, Nkem, and Ibibia demanded arbitration against the Kaiser entities, explaining that their arbitration claim, which they characterized as a wrongful death action, arose out of "the negligent attention and care and lack of informed consent" regarding the cancer treatment decedent received from September 2012 to May 2015. They asserted that "professional negligence and lack of informed consent were the factual and proximate cause of [decedent's] death."

In May 2017, Stella, Nkem, and Ibibia, proceeding as self-represented litigants, filed a civil action against the Kaiser entities, which sought an order rescinding the arbitration agreement due to the entities' failure to show the existence of a valid agreement. The trial court sustained the Kaiser entities' demurrer without leave to amend and entered judgment in their favor. Meanwhile, Stella, Nkem, and Ibibia withdrew from the arbitration proceedings.

In May 2018, Stella, Nkem, and Ibibia, proceeding as self-represented litigants, filed this action against the Kaiser entities, as well as a nurse and several doctors, including Dr. Buchanan and Dr. Eyolfson. The complaint, which was styled as a complaint for wrongful death, asserted claims for lack of informed consent, fraud, and negligent misrepresentation. The claims were predicated on the failure to disclose "the evils associated with Lupron therapy, Effexor, and radioactive gold seeds," false representations about or concealment of "the known and material risks associated with Lupron therapy and radioactive gold seeds," and negligent misrepresentations about "the truth concerning the evils of Lupron therapy."

---

notice is required, but it shall notify the defendant of the legal basis of the claim and the type of loss sustained, including with specificity the nature of the injuries suffered." (§ 364, subd. (b).) The purpose of the statutory 90-day waiting period for filing a medical malpractice action " 'is to decrease the number of medical malpractice actions filed by establishing a procedure that encourages the parties to negotiate "outside the structure and atmosphere of the formal litigation process." ' " (*Bennett v. Shahhal* (1999) 75 Cal.App.4th 384, 389.)

After the trial court sustained various demurrers, a third amended complaint (the operative complaint) was filed in August 2019. The operative complaint, which was filed by Stella, decedent and Stella's six children, and their daughter-in-law, added three pharmaceutical companies and two nurses as defendants, as well as a number of new claims, including claims for strict products liability against the pharmaceutical companies.

The operative complaint asserted a variety of claims against Dr. Buchanan and Dr. Eyolfson, including claims styled as follows: (1) fraud by intentional false misrepresentation; (2) fraud by negligent misrepresentation; and (3) fraudulent concealment, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing (hereafter fraud claims).[5] The fraud claims were predicated on Dr. Buchanan's and Dr. Eyolfson's failure to disclose pertinent information regarding decedent's cancer treatment, including their failure to warn him about the risks and side effects associated with Lupron, the placement of gold seeds within his prostate, and the medication Effexor. As for the discovery of the fraud claims, the operative complaint stated: "After independent research and consultation with other healthcare providers, it became apparent to plaintiffs from about July 2016 and thereafter, that the defendant nurses and medical doctors had knowingly and intentionally deceived and defrauded decedent on his diagnosis and treatment. It became apparent that the defendant medical doctors, nurses, and pharmaceutical manufacturers of Effexor, gold seeds, and Lupron were working in concert in a conspiracy to defraud patients like decedent and intentionally conceal the

---

[5] As the trial court observed, the operative complaint did not specify which of the 13 claims were alleged against which particular defendant(s). However, in their filings, the plaintiffs clarified that only four claims were alleged against Dr. Buchanan--the fraud claims and the claim for loss of consortium. The plaintiffs also clarified that the claims alleged against Dr. Eyolfson were limited to the fraud claims and the following additional claims: constructive fraud, declaratory relief, wrongful death, enhancement of harm, and joint venture/enterprise and conspiracy.

7

known risks or warnings from him." According to plaintiffs, the medical risks related to decedent's cancer treatment were concealed from him, and that intentionally false or negligent misrepresentations were made to him about the risks of his treatment, including the side effects associated with Lupron (e.g., bone pain, chronic joint pain, decreased bone density). Plaintiffs asserted that, had decedent been aware of the "facts, risks, and injuries associated with the subjected medical procedures," he would not have "acted as he did," that is, "continue with the medical procedures." Plaintiffs further asserted that, because decedent was not adequately informed and warned of the medical risks associated with his cancer treatment, he did not give informed consent to the Lupron injections, the placement of gold seeds within his prostate, or the medication Effexor.

Stella's fraud claims were the only claims that remained at issue as to Dr. Buchannan and Dr. Eyolfson after the trial court sustained their demurrers to the operative complaint without leave to amend. In addition to sustaining these demurrers, the court sustained the demurrers filed by other defendants (including the pharmaceutical defendants) in their entirety without leave to amend. The court also granted the non-pharmaceutical defendants' motion to strike the punitive damages allegations.

In March 2020, Dr. Buchanan moved for summary judgment on Stella's fraud claims. The trial court granted the motion in October 2020, finding that the claims were, in substance, claims for medical malpractice or wrongful death and barred by the statute of limitations. The court also found that summary judgment was warranted on the merits as to each claim.

In July 2020, Dr. Eyolfson moved for summary judgment on Stella's fraud claims. The trial court granted the motion in January 2021, finding that summary judgment was warranted for essentially the same reasons articulated in the order granting summary judgment in favor of Dr. Buchanan, including that the fraud claims were time-barred.

Stella timely appealed from the judgments of dismissal entered in favor of Dr. Buchanan and Dr. Eyolfson in February 2021. The case was fully briefed on December

8

28, 2021, and assigned to this panel in January 2022. The parties waived argument and the case was submitted on March 25, 2022.

## DISCUSSION

### I

### *Standard of Review*

On a motion for summary judgment, a defendant must show "that one or more elements of the cause action . . . cannot be established, or that there is a complete defense to the cause of action." (§ 437c, subd. (p)(2).) A defendant need only provide evidence showing that the plaintiff cannot prove his or her case. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853-855.)

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).) A triable issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment. (*Aguilar v Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 850.)

We independently review the trial court's decision to grant a defendant's motion for summary judgment. (*Yanowitz, supra*, 36 Cal.4th at p. 1037.) In doing so, "we apply the traditional three-step analysis used by the trial court, that is, we (1) identify the pleaded issues, (2) determine if the defense has negated an element of the plaintiff's case or established a complete defense, and if and only if so, (3) determine if the plaintiff has raised a triable issue of fact." (*Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 175.) "We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630.)

Our review is governed by a fundamental principle of appellate procedure, namely, that " '[a] judgment or order of the lower court is *presumed correct*,' " and thus,

9

" 'error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Under this principle, plaintiff bears the burden of establishing error on appeal, even though defendants had the burden of proving their right to summary judgment before the trial court. (*Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 474.) For this reason, our review is limited to contentions adequately raised and supported in plaintiff's brief. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125-126.)

## II

### *Statute of Limitations*

Stella contends reversal is warranted because the trial court erred in determining that her fraud claims were time-barred. We disagree.

A. *Applicable Legal Principles*

In 1975, the Legislature enacted the Medical Injury Compensation Reform Act (MICRA) in response to a "medical malpractice crisis." (*Perry v. Shaw* (2001) 88 Cal.App.4th 658, 667.) In enacting MICRA, "the Legislature 'attempted to reduce the cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation.' " (*Woods v. Young* (1991) 53 Cal.3d 315, 319.) As relevant here, MICRA includes section 340.5, which shortened the limitations period for malpractice actions. (*Larson v. UHS of Rancho Springs, Inc*. (2014) 230 Cal.App.4th 336, 346 (*Larson*).)

Section 340.5 provides in part: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud,

10

(2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person."

"A plaintiff in a medical malpractice action must satisfy the requirements of both the one-year and the three-year limitations periods." (*Drexler v. Petersen* (2016) 4 Cal.App.5th 1181, 1189.) Courts have held that the tolling provision in section 340.5 only applies to the three-year limitations period. (See, e.g., *Graham v. Hansen* (1982) 128 Cal.App.3d 965, 974 (*Graham*).) Here, to the extent section 340.5 applies, it is not disputed that the one-year statute of limitations is at issue.

Section 340.5 defines "professional negligence" (i.e., medical malpractice) as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." "The term 'professional negligence' encompasses actions in which 'the injury for which damages are sought is directly related to the professional services provided by the health care provider [citation] or directly related to 'a matter that is an ordinary and usual part of medical professional services.' [Citation.] '[C]ourts have broadly construed "professional negligence" to mean negligence occurring during the rendering of services for which the health care provider is licensed.' " (*Arroyo v. Plosay* (2014) 225 Cal.App.4th 279, 297.)

A doctor's failure to disclose pertinent information regarding treatment, including all known potential complications material to a patient's decision, is medical negligence. (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 240-245 [a doctor has a duty to disclose all information relevant to a patient's meaningful decisional process, including "the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each" (*id*. at p. 243)] (*Cobbs*); *Larson, supra*, 230 Cal.App.4th at

11

p. 349; see *Massey v. Mercy Medical Center Redding* (2009) 180 Cal.App.4th 690, 698 [a medical act performed without a patient's informed consent is medical negligence].)

For purposes of section 340.5, the term "injury" means "both the negligent cause and the damaging effect of the alleged wrongful act and not the act itself." (*Steketee v. Lintz, Williams & Rothberg* (1985) 38 Cal.3d 46, 54.) There must be some manifestation of appreciable harm. (*Brown v. Bleiberg* (1982) 32 Cal.3d 426, 437, fn. 8.) However, a person need not know the actual negligent cause of an injury; mere *suspicion* of professional negligence suffices to trigger the limitation period. (*Massey v. Mercy Medical Center Redding*, *supra*, 180 Cal.App.4th at p. 699; *Knowles v. Superior Court* (2004) 118 Cal.App.4th 1290, 1295; see *Garabet v. Superior Court* (2007) 151 Cal.App.4th 1538 [statute of limitations commences to run when the patient is aware of the physical manifestations of his or her injury without regard to awareness of the negligent cause].)

Under the discovery rule of section 340.5, "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110.) "This rule sets forth two alternate tests for triggering the limitations period: (1) a subjective test requiring actual suspicion by the plaintiff that the injury was caused by wrongdoing; and (2) an objective test requiring a showing that a reasonable person would have suspected the injury was caused by wrongdoing. [Citation.] The first to occur under these two tests begins the limitations period." (*Kitzig v. Nordquist* (2000) 81 Cal.App.4th 1384, 1391.) "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co., supra*, 44 Cal.3d at p. 1111.)

12

Although section 340.5 facially applies to professional negligence actions, it is not limited to such actions. Our Supreme Court has explained that in the context of actions by patients against their health care providers, there often is considerable overlap between intentional and negligent causes of action. (*Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 192.) Accordingly, "[b]ecause acts supporting a negligence cause of action might also support a cause of action for an intentional tort, [the high court has] not limited application of MICRA provisions to causes of action that are based solely on a 'negligent act or omission' as provided in these statutes." (*Ibid*.) Instead, it has held that an action for damages may arise out of or be based on the professional negligence of a health care provider, even if such action is characterized as an intentional tort. (*Id.* at pp. 191-192.)

Because of the overlap between negligent and intentional torts in the health care context, plaintiffs sometimes will choose to assert intentional torts (e.g., battery, products liability, fraud, and intentional or negligent infliction of emotional distress) in the hope of evading the restrictions of MICRA. (*Unruh-Haxton v. Regents of University of California* (2008) 162 Cal.App.4th 343, 353; *Smith v. Ben Bennett, Inc.* (2005) 133 Cal.App.4th 1507, 1514.) Thus, "when a plaintiff asserts a claim against a health care provider on a legal theory other than professional negligence, courts must determine whether the claim is nonetheless *based on the health care provider's professional negligence*, which would require application of MICRA." (*Larson, supra,* 230 Cal.App.4th at p. 347.) In making this determination, courts "must focus on the nature or gravamen of the claim, not the label or form of action the plaintiff selects." (*Ibid.* ["courts must examine not only the legal theory alleged, but also the nature of the health care provider's alleged conduct and the legislative history of the MICRA provision at issue"].)

B. *Analysis*

In finding Stella's fraud claims untimely, the trial court determined that they were, in substance, claims for medical malpractice and barred by the one-year statute of limitations set forth in section 340.5. The court additionally found that, even assuming the fraud claims were properly construed as claims for wrongful death and did not fall within the ambit of section 340.5, they were nonetheless barred by the two-year statute of limitations applicable to wrongful death claims, since they were not brought until nearly three years after decedent died. (§ 335.1; see *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 404 [generally, "the date of accrual of a cause of action for wrongful death is the date of death"].)

On appeal, Stella makes a number of arguments as to why reversal is required, but tacitly acknowledges that her fraud claims are time-barred if either of the limitations periods relied upon by the trial court applies, unless the applicable limitations period is tolled due to delayed discovery. As we explain next, we conclude that the trial court properly granted summary judgment in favor of Drs. Buchanan and Eyolfson.

It has long been held that the one-year medical malpractice statute of limitations, rather than the three-year statute of limitations for fraud, applies when a plaintiff pleads a professional negligence claim based on false representations or fraudulent concealment on the part of a doctor. (*Tell v. Taylor* (1961) 191 Cal.App.2d 266, 271; see also *Weinstock v. Eissler* (1964) 224 Cal.App.2d 212, 227.) Here, the record makes clear that Stella's fraud claims are predicated on the professional negligence of decedent's health care providers, and that this action was not commenced within one year after she suspected that decedent's alleged injuries were caused by such negligence. Indeed, the record discloses that Stella was aware of the basis for her fraud claims more than two years before she filed this action. At the latest, Stella suspected wrongdoing on the part of decedent's health care providers in March 2016. At that time, she provided Kaiser written notice of her intent to file a medical malpractice action against it and its

14

employees, which was predicated on incompetent care, including the failure to disclose pertinent information to decedent about his cancer treatment.[6] Stella, however, did not commence this action until May 2018, nearly 14 months after the one-year medical malpractice statute of limitations expired. Stella's attempt to recast her professional negligence claims as claims for fraud, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing, does not entitle her to a longer statute of limitations. As such, the trial court properly determined that her claims were time-barred. (See *Dolan v. Borelli* (1993) 13 Cal.App.4th 816, 823 [medical malpractice claim time-barred because undisputed facts showed plaintiff suspected doctor had improperly treated her and made her condition worse more than one year before action was filed]; *Graham, supra,* 128 Cal.App.3d at pp. 973-975 [medical malpractice claim time-barred because plaintiff was aware of all essential facts on which her claim was based more than one-year before filing suit]; *Rose v. Fife* (1989) 207 Cal.App.3d 760, 769 [medical malpractice claim time-barred because plaintiff had " 'reasonably founded suspicions' " she had been harmed by doctor's treatment more than one year before filing suit].)

Even if we were to conclude the two-year statute of limitations for wrongful death claims (§ 335.1) applies to any of Stella's fraud claims, the claim(s) would be time-barred. Stella filed this action nearly three years after decedent died in May 2015 and more than two years after she was aware of the basis for a wrongful death claim. As such, any wrongful death claim is untimely. We reach the same conclusion with respect to Stella's contention that the operative complaint alleges a cognizable claim for medical

---

[6] Stella incorrectly suggests that giving a health care provider notice of intent to file a malpractice action automatically tolls the statute of limitations for 90 days. By its express terms, the tolling provision in section 364 only applies in limited circumstances. Section 364, subdivision (d) states: "If the notice is served within 90 days of the expiration of the applicable statute of limitations, the time for the commencement of the action shall be extended 90 days from the service of the notice." This provision clearly does not apply here.

battery based on a lack of informed consent.  (See *Daley v. Regents of University of California* (2019) 39 Cal.App.5th 595, 602-603 [claim for medical battery is subject to the two-year statute of limitations in section 335.1].)  In reaching this conclusion, we need not decide whether the operative complaint sufficiently alleges a claim for medical battery.  However, we see no allegations that would support such a claim.  (See *Cobbs*, *supra*, 8 Cal.3d at p. 239 ["[w]here a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a substantially different treatment for which consent was not obtained, there is a clear case of battery"]; *Larson, supra*, 230 Cal.App.4th at pp. 348-349 [intentional misconduct by a health care provider, including deliberately deviating from the consent that was given, constitutes the intentional tort of medical battery].)  Indeed, the lack of informed consent alleged in the operative complaint is predicated on the failure of decedent's health care providers to disclose pertinent information associated with his cancer treatment, including the medical risks and/or complications associated with Lupron.  This is a claim for medical negligence, not medical battery.  (See *Cobbs*, *supra*, 8 Cal.3d at pp. 240-245; *Larson, supra*, 230 Cal.App.4th at p. 349.)

We are similarly unpersuaded by Stella's contention that her fraud claims are not time-barred due to delayed discovery.  "While the reasonableness of a delayed discovery is ordinarily a question of fact, the issue presents a question of law when the evidence establishes beyond dispute that the plaintiff has failed to bring the action within one year after notice of its existence."  (*Graham*, *supra*, 128 Cal.App.3d at p. 972.)  In medical malpractice cases, " '[t]he test is whether the plaintiff has information of circumstances sufficient to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his or her investigation.' "  (*Ibid*.)  As we have explained *ante*, the record clearly establishes that Stella was aware of the basis of her professional negligence claims against Dr. Buchanan and Dr. Eyolfson by no later than March 2016, more than *two* years before she filed this action in May 2018.

16

Further, Stella concedes that she was aware of the basis of her professional negligence claims more than one year before filing suit. In her opening brief, Stella asserts that she was able to "find enough facts to raise suspicion" of respondents' "fraud/deceit" by July 2016. She further asserts that, "Respondents' misrepresentations and ongoing reassurances [(e.g., Lupron did not cause harm to decedent)] continued until about July 2016, when [she] suspected otherwise." These assertions are consistent with the allegations in the operative complaint, which stated: "After independent research and consultation with other healthcare providers, it became apparent to [Stella] from about July 2016 and thereafter, that the defendant[s] . . . had knowingly and intentionally deceived and defrauded decedent on his diagnosis and treatment." In short, even if we were to overlook Stella's March 2016 notice of intent to file a medical malpractice action, the statute of limitations began to run on her professional negligence claims, at the latest, in July 2016. At that point, Stella believed decedent's health care providers had done something wrong in connection with their treatment of decedent, but did not file this action until May 2018, well-beyond the one-year statute of limitations for medical malpractice claims.

Stella cites no authority supporting her conclusory contention that her fraud claims are timely because "they all relate back to the arbitration proceedings." As a consequence, no further discussion of this issue is required. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 [conclusory arguments not supported by pertinent legal authority may be disregarded]; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 [arguments not supported by citation to authority may be treated as waived].)[7]

---

[7] In light of our conclusion that Stella's fraud claims are time-barred, we need not and do not address whether summary judgment was properly granted on the merits in favor of Drs. Buchanan and Eyolfson.

17

III

*Remaining Issues*

We need not decide whether the trial court erred in sustaining various objections to the declaration executed by Stella's medical expert, as this evidence has no bearing on our resolution of the pending appeals.  (*Swanson v. State Farm General Ins. Co.* (2013) 219 Cal.App.4th 1153, 1165, fn. 11.)  Nothing in the expert's declaration suggests that the trial court erred in granting summary judgment based on the statute of limitations.[8] Thus, any evidentiary error was clearly harmless.  For the same reason, we reject Stella's suggestion that reversal is required because the trial court erred in overruling her objections to the expert medical declaration relied on by Dr. Buchanan and Dr. Eyolfson.

We also reject Stella's suggestion that reversal is required because the trial court failed to grant her request for a continuance to allow for further discovery under section 437c, subdivision (h).  Stella has not shown error.  She has made no showing that a continuance was warranted under the circumstances of this case, including an explanation of how the evidence she sought to obtain was essential to opposing the statute of limitations defense.  (See *Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1270 [the party seeking a continuance of summary judgment proceedings must show that the facts to be obtained are essential to opposing the motion, there is reason to believe such facts may exist, and the reasons why additional time is needed to obtain those facts]; *Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020, 1038 [in

---

[8] After the record on appeal was filed, Stella requested we take judicial notice of various documents that were filed in the trial court but not included in the appellate record, including the declaration executed by Stella's medical expert.  We construed Stella's request as a motion to augment the appellate record and granted the motion in part and denied it in part.  The medical expert's declaration is among the documents included in the augmented record.

18

exercising its discretion to grant a continuance, the trial court may consider whether the requesting party's failure to secure the evidence at issue was due to a lack of diligence].)

Finally, we find no merit in the remaining contentions Stella raises on appeal. For example, Stella claims the trial court erred in sustaining the doctors' demurrers to the operative complaint as to certain claims (e.g., strict products liability, negligent and intentional infliction of emotional distress), but the record reflects, as we noted *ante*, that she conceded in the trial court that these claims were not brought against the doctors. This was tantamount to acquiescence to the challenged rulings, which bars her from raising this issue on appeal. (*In re Marriage of Broderick* (1989) 209 Cal.App.3d 489, 501 ["an appellant waives his right to attack error by expressly or implicitly agreeing or acquiescing . . . to the ruling or procedure objected to on appeal"]; see also *Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 181.)[9] Further, while Stella contends that the trial court erred in granting the motion to strike the punitive damages allegations, there are no remaining viable claims against Dr. Buchanan or Dr. Eyolfson. As such, we need not decide whether the trial court erred in this regard, because any error was clearly harmless.[10]

---

[9] Although Stella contends the trial court erred in determining that her loss of consortium claim was time-barred, she did not allege such a claim against Dr. Buchanan or Dr. Eyolfson. The operative complaint makes clear that the loss of consortium claim was only alleged by Stella's daughter-in-law against the pharmaceutical defendants.

[10] Stella contends for the first time in her reply brief that orders issued by Judge Krueger (e.g., the October 2020 order granting summary judgment in favor of Dr. Buchanan) must be voided because he was disqualified from presiding over this case in January 2021 due to a financial conflict of interest. As an initial matter, we need not consider this untimely argument. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 158 [appellate courts ordinarily do not consider arguments raised for the first time in a reply brief]; *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 592 [reply arguments are forfeited as untimely].) But even had this issue been timely raised, Stella has failed to demonstrate error by means of a cogent argument supported by legal analysis and citation to the record. (*United Grand Corp.,* at p. 153.) She provides no citations to the record

## DISPOSITION

The judgments are affirmed.  Respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

/s/
_____
Duarte, J.

We concur:

/s/
_____
Hull, Acting P. J.

/s/
_____
Mauro, J.

---

and directs us to one case that stands for the proposition that rulings of a trial judge later found to be disqualified are " 'voidable if properly raised by an interested party.' " (*Urias v. Harris Farms, Inc.* (1991) 234 Cal.App.3d 415, 423-424 [summary judgment order issued by disqualified judge is voidable].)  Our independent review of the record reveals no information related to the disqualification issue, except for a February 2021 minute order that stated:  "Judge Krueger having recused himself from this matter under . . . section 170.1, subdivisions (a)(3)(A) and (a)(3)(b)(ii) due to a recent testamentary event . . . ."  We see no basis for voiding any of Judge Krueger's orders.

20