Filed 8/14/25  Ito v. Kaiser Foundation Health Plan CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JEFFREY ITO, Plaintiff and Appellant, v. KAISER FOUNDATION HEALTH PLAN, INC., Defendant and Respondent. | B337176 (Los Angeles County Super. Ct. No. 23PSCV00412) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bryant Y. Yang, Judge.  Affirmed.

Jeffrey Ito, in pro. per., for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, Alysia B. Carroll; La Follette, Johnson, DeHaas, Fesler & Ames, Arthur E. Zitsow and Robert Y. Rhoten for Defendant and Respondent.

# INTRODUCTION

In this medical malpractice action Jeffrey Ito appeals from the judgment entered after the trial court granted Kaiser Foundation Health Plan's motion for summary judgment. Ito argues the trial court erred in granting Kaiser's motion for summary judgment because there were triable issues of material fact regarding whether the statute of limitations barred Ito's action and whether Kaiser was negligent. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *Ito Enrolls in Kaiser and Asks To Be Referred to a Neuroscientist*

In April 2021 Ito purchased health insurance through Kaiser. On May 24, 2021 Ito saw a nurse practitioner for a routine physical examination and requested a "referral to a neuroscientist." The nurse practitioner told Ito to direct his request to his primary care physician, Dr. John Waldron.

Ito sent an email to Dr. Waldron requesting a referral to a neuroscientist. A few days later Ito sent another email to Dr. Waldron stating he "would like to scan [his] brain field." On June 1, 2021 Dr. Waldron replied: "I suspect you are inquiring about a neurology referral? Neuroscience is not a clinical field." Dr. Waldron told Ito that, if he had urgent neurological symptoms before their scheduled appointment a week later, he should go to urgent care or the emergency room. Ito replied: "I have seen a neurologist already. The main professional that I would like to see is a neuroscientist."

### B.  *Ito's Primary Care Physician Refers Him to a Psychiatrist*

On June 7, 2021 Ito had his first appointment with Dr. Waldron.  He told Dr. Waldron that "his friends, colleagues and family feel he has a mental health problem."  He "repeatedly asked to be referred to a neuroscientist."  Dr. Waldron "attempted to educate him about the field of neuroscience" and told him Kaiser did "not have a clinic[al] neuroscientist on staff."  Dr. Waldron suspected Ito had obsessive compulsive disorder and referred him to a psychiatrist "to evaluate further."  That same day Ito had an intake telephone call with the psychiatry department.

On June 12, 2021 Ito sent an email to Dr. Waldron stating: "I believe that there is a person who has been listening to my thoughts for some time now after using a quantum computer from the other side of a wall."  Ito said that he was not seeking "a psychiatric specialist" and that he "would like a referral for a professional neuroscientist who specializes in the quantum field."  Dr. Waldron replied two days later and told Ito that he recommended Ito "follow through with the psychiatry referral," that the psychiatry department "can best handle your unique issues," and that Kaiser "does not have clinical neuroscientists."  Dr. Waldron submitted another referral to the psychiatry department, stating that Ito apparently cancelled his appointment with a psychiatric social worker and that he "clearly needs psychiatric help."

On June 25, 2021 Ito had a telephonic evaluation with a therapist in the psychiatry department.  Ito told the therapist he was "experiencing a 'high level problem that only a neuroscientist

can help [him] with,'" though Ito "refused to share further details on symptoms."

### C. *Ito Sees a Psychiatrist, Who Recommends Medication and Therapy for Psychotic Symptoms*

On July 20, 2021 Ito had a video evaluation with psychiatrist Dr. Rhiana Roque. Dr. Roque told Ito that she was a psychiatrist, not a neuroscientist, but that the two fields overlapped. Ito told Dr. Roque he had "a very important problem and only a neuroscientist would know how to diagnose it." He said he was looking for "someone who does research in the field of holography" for his "'biological vision'" because people were "stalking him and possibly inquiring about his passwords, online accounts, and his 'memory passwords.'" Ito said he had been experiencing these feelings and suspicions since 2017. He said that he was once hospitalized and diagnosed with schizophrenia, but that he did not take the prescribed medication after he was discharged because he did not think it helped. Dr. Roque told Ito that he had psychotic symptoms and recommended medication and therapy, but Ito declined medication, repeated he needed "holography," and asked for a referral to a neuroscientist.

### D. *Ito Declines Psychiatric Treatment and Continues To Request a Referral to a Neuroscientist*

In the following months Ito continued to ask for a referral to a neuroscientist. On July 22, 2021 he sent an email to Dr. Roque stating he spoke with medical staff at UCLA about seeing "an expert neuroscientist" and asking Dr. Roque to send a referral to UCLA. A nurse called Ito and told him how to obtain his records from Dr. Roque, but said Kaiser was "not

4

recommending he consults with a neuroscientist" because it was "not medically necessary for his condition." On August 14, 2021 Ito sent an email to Dr. Roque stating the "UCLA Neuroscientist department" required more information and asking for a referral to neurology for an electroencephalogram scan.[1] A nurse responded to Ito: "Dr. Roque has reviewed your request, and shares that what you are requesting is not medically indicated for your condition of Psychotic disorder per her assessment. She apologizes, but can not help with this request. She includes that her treatment plan remains the same."

On September 6, 2021 Ito sent an email to Dr. Waldron asking whether "holography can be used to study the associative memory and consciousness of the human brain." A nurse called Ito and left a message asking him to call back and schedule an appointment with Dr. Roque. On September 9, 2021 Dr. Waldron sent Ito an email recommending he follow up with the psychiatrist and stating Ito's symptoms were "highly suggestive of a psychiatric disorder that will only improve with proper treatment." On September 14, 2021 Ito replied to Dr. Waldron asking what "type of treatment" he was suggesting and whether Kaiser could facilitate an appointment with an expert in "holographic memory for consciousness."

On September 25, 2021 a nurse called Ito and offered him an appointment with Dr. Roque. Ito said that Dr. Roque was not able to provide what he was requesting and that he was not interested in psychiatric medications. That night Ito sent Dr. Waldron an email asking him to refer Ito to a "neuroscientist

---

[1]     An electroencephalogram, or EEG, is a test that records electrical activity in the brain. (*People v. Steele* (2002) 27 Cal.4th 1230, 1241.)

or consciousness researcher." On September 28, 2021 Dr. Waldron responded: "Sorry, as I've told you several times previously, Kaiser Permanente does not have clinical neuroscientists that I can refer you to, nor is this what I would recommend. I also suspect you have a psychiatric illness Jeffrey, possibly schizophrenia. I would suggest following up with Dr. Roque and at least trying the treatment she suggests and see if it makes a difference for you. I don't see the harm in doing so, and it may really help you." On September 29, 2021 Ito sent an email to Dr. Roque asking about a "referral to a UCLA neuroscientist." A few minutes later he sent an email to Dr. Waldron stating he did not want "pharmaceutical products" and asking for "a referral for a neuroscientist through Kaiser." A nurse replied to Ito's email to Dr. Roque, stating a referral to a neuroscientist was "not medically indicated." Another nurse replied to Ito's email to Dr. Waldron, stating Kaiser did not have clinical neuroscientists.

On September 30, 2021 Ito sent an email to the nurse practitioner he had seen in May 2021 asking to "see a neuroscientist in the field of digital holographic microscopy research." The nurse practitioner instructed Ito to contact his primary care physician.

On October 2, 2021 Ito sent an email to Dr. Waldron asking him to "send the medical/clinical results from Kaiser directly to a neuroscientists clinic so they can move forward with the testing." A few minutes later Ito sent another message stating: "I think it is literally possible for us to collect data from my Microtubule network to further our initial diagnosis." On October 5, 2021 a nurse responded and told Ito how to request his medical records.

### E. *Ito Asks for Advanced Diagnostic Imaging*

On December 28, 2021 Ito sent an email to Dr. Waldron asking for a functional magnetic resonance imaging scan to evaluate his "cognitive functions."[2]  On January 3, 2022 Dr. Waldron replied, stating evaluation "for advanced diagnostic imaging, such as an fMRI, would have to be done through a specialty department, such as psychiatry or neurology," and advising Ito to follow up with his psychiatrist.  On January 30, 2022 Ito sent a message to Dr. Waldron asking for a referral to a neurologist to get a transcranial focused ultrasound treatment.  Dr. Waldron placed a referral to the neurology department.  On January 31, 2022 Dr. Waldron told Ito the neurology department declined the referral and "recommended to schedule a followup with your psychiatrist, as do I."

### F. *Dr. Roque Orders a CT Scan, but Ito Continues To Request Advanced Imaging*

On February 10, 2022 Ito sent an email to Dr. Roque requesting an fMRI and a transcranial focused ultrasound.  Dr. Roque told Ito those tests were not indicated, but she ordered a "non-contrast head CT [computerized tomography scan] to rule out lesions that may be contributing" to his symptoms.  Ito agreed to undergo the CT scan, but on February 22, 2022 sent an

---

[2]  A functional magnetic resonance imaging scan, or fMRI, allows researchers "to examine the brain's activation and responses to stimuli and environmental context." (*Commonwealth v. Mattis* (2024) 493 Mass. 216, 225, fn. 14; see *Rocky Mountain Gun Owners v. Polis* (10th Cir. 2024) 121 F.4th 96, 126 [fMRI permits "'scientists and researchers to . . . observe the brains of living individuals and examine their responses to various stimuli and activities'"].)

email to Dr. Roque again requesting an fMRI and transcranial focused ultrasound "to measure the waveforms of [his] consciousness." On February 24, 2022 Dr. Roque replied to Ito: "As much as I'd like to help you, unfortunately, I disagree based on my medical knowledge, these tests you are requesting are not medically necessary. I reviewed the results of your CT scan, and they are normal, so no further testing is required." That night Ito responded, stating that, because the CT scan was normal, "[w]e can rule out schizophrenia for good." Ito again requested an fMRI and a transcranial focused ultrasound because he was "experiencing a rambling voice as well as visualizations." On February 25, 2022 Ito sent a similar message to Dr. Waldron and another message to Dr. Roque asking about "other advanced imaging" that could be done to identify the cause of his symptoms. Dr. Roque replied to Ito: "The diagnosis has not changed. It remains Psychotic disorder (and Schizophrenia falls under this category). What I meant in my previous email was that as per the CT scan there is no lesion in your brain that would explain your psychotic symptoms, and further imaging like an MRI or ultrasound are unnecessary. This normal brain CT confirms you have a psychiatric disorder, not a neurological one. I apologize I don't have much else to offer you other than antipsychotic medications as we discussed in our July appointment."

On March 1, 2022 Ito sent an email to Dr. Roque asking to be "reevaluated" and requesting an fMRI and a transcranial focused ultrasound. Ito stated that the CT showed he did not have schizophrenia and that his "neighbor did something to [his] consciousness state that invoked a rambling voice in the middle of the night." A few minutes later Ito sent an email to

8

Dr. Waldron stating that the CT scan showed he did not have schizophrenia and that he "insist[ed] on seeing a neurologist who can help [him] evaluate [his] medical condition." Dr. Waldron responded the same day, explaining that imaging cannot rule out psychiatric disorders and that the referral to neurology was declined. Dr. Waldron recommended Ito keep an upcoming appointment with a neurologist at UCLA and "reconsider the treatment" the psychiatrist recommended. Dr. Waldron also stated: "You can see a different primary care physician if you want Jeffrey. You know my thoughts and recommendations about your condition." A nurse from the psychiatry department sent Ito a message stating no further testing was indicated and asking him to call to schedule an appointment.

G.      *Ito Terminates His Coverage with Kaiser*

In March 2022 Ito requested a new provider. On April 5, 2022 Ito had a checkup with his new primary care physician, Dr. Timothy Tran. Ito asked Dr. Tran for an fMRI of his brain because he thought his neighbor was "'using holograms to put voices and images in his mind.'" Dr. Tran wrote in Ito's chart that "what he told me about his neighbor is delusional" and told Ito to follow up with psychiatry. In June 2022 Ito terminated his Kaiser coverage.

H.      *Ito Files This Action Against Kaiser*

Ito filed this action against Kaiser on February 14, 2023. In his operative first amended complaint Ito asserted one cause of action against Kaiser for medical negligence. Ito alleged Kaiser wrongly diagnosed him with obsessive compulsive disorder, schizophrenia, and psychotic disorder; prescribed unnecessary

medication; denied him a referral to a neuroscientist or a neurologist; and denied him high resolution brain imaging.

I.  *The Trial Court Denies Ito's Motion for Summary Judgment and Grants Kaiser's Motion for Summary Judgment*

In July 2023 Ito moved for summary judgment.  Ito argued Kaiser misdiagnosed him and prescribed unnecessary medication.  He stated it was "unlikely that expert testimony will be necessary" to establish Kaiser's negligence.  The trial court denied Ito's motion.  The court ruled that, because Ito did not provide expert testimony Dr. Waldron or Dr. Roque breached the applicable standard of care, he did not meet his burden of demonstrating there were no triable issues of material fact.  The court also stated Ito did not show how Kaiser, which presented evidence it did not provide health care services or medical treatment, was liable for Dr. Waldron's and Dr. Roque's alleged negligence.

In October 2023 Kaiser moved for summary judgment.  Kaiser argued that, as a membership organization, it did not provide any medical care to Ito; that Ito's cause of action was barred by the statute of limitations; that Ito's medical providers complied with the applicable standard of care; and that Ito's medical providers did not cause any injury.  In support of its motion Kaiser submitted the declaration of Dr. David Alexander, a board-certified neurologist.  In opposition to Kaiser's motion Ito submitted the declaration of Dr. Anish Desai, a New York hospitalist.  Dr. Desai stated Kaiser breached its duty of care to Ito by failing to rule out alternative causes of his symptoms,

10

order additional imaging, and refer him to a neuroscientist or neurologist.

The trial court granted Kaiser's motion for summary judgment. The court ruled Ito's cause of action for medical negligence was barred by Code of Civil Procedure section 340.5, which requires a plaintiff to file an action for professional negligence against a health care provider within "'three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first.'" The court stated Kaiser presented undisputed evidence Dr. Waldron and Dr. Roque denied Ito's requests to refer him to a neuroscientist and for holography, fMRI, and transcranial focused ultrasound tests at least 10 times between May 24, 2021 and January 31, 2022. Therefore, the court ruled, Ito should have known he was receiving allegedly negligent care no later than January 31, 2022. The court also ruled Kaiser was entitled to summary judgment because, as a health care service plan, Kaiser did not employ Dr. Waldron or Dr. Roque or provide any medical care. The court entered judgment for Kaiser, and Ito timely appealed.

## DISCUSSION

### A. *Applicable Law and Standard of Review*

"'A motion for summary judgment or summary adjudication is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."'" (*Campbell v. FPI Management, Inc.* (2024) 98 Cal.App.5th 1151, 1161; see Code Civ. Proc., § 437c, subd. (c); *Regents of*

11

*University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)  "'A defendant may bring a motion [for summary judgment] on the ground the plaintiff cannot prove one of the required elements of the case or there is a complete defense to the action.'" (*Campbell*, at pp. 1161-1162; see *Luebke v. Automobile Club of Southern California* (2020) 59 Cal.App.5th 694, 702.)  To carry its initial burden, the defendant must show that the plaintiff cannot establish "'at least one element of the cause of action'" (*Campbell*, at p. 1162) or that "undisputed facts establish an affirmative defense" (*Filosa v. Alagappan* (2020) 59 Cal.App.5th 772, 778). "'Only after the defendant carries that initial burden does the burden shift to the plaintiff "to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto."'" (*Campbell*, at p. 1162.)  "'There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof' at trial." (*Esplanade Productions, Inc. v. The Walt Disney Co.* (2023) 93 Cal.App.5th 793, 805; see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

"'We review the trial court's grant of summary judgment de novo and decide independently whether the parties have met their respective burdens and whether facts not subject to triable dispute warrant judgment for the moving party as a matter of law.' [Citations.]  "'We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party."'" (*Drexler v. Petersen* (2016) 4 Cal.App.5th 1181, 1188; see *Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

12

B.    *The Trial Court Did Not Err in Granting Kaiser's Motion for Summary Judgment*

Ito argues the trial court erred in granting Kaiser's motion for summary judgment.  Kaiser argues it was entitled to summary judgment because the undisputed facts showed (1) the statute of limitations barred Ito's cause of action and (2) Kaiser did not breach its duty of care to Ito and was not vicariously liable for the alleged negligence of Ito's medical providers.  Kaiser is correct on both points.

1.    *The Statute of Limitations Bars Ito's Cause of Action for Medical Negligence*

Code of Civil Procedure section 340.5 states:  "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first."  (See *Gutierrez v. Tostado* (2025) ___ Cal.5th ___, ___ [2025 WL 2169453, p. 3].)  "For purposes of the one-year period, discovery of the injury means the plaintiff has discovered 'both his or her injury and its negligent cause.'" (*Filosa v. Alagappan*, *supra*, 59 Cal.App.5th at p. 779; see *Drexler v. Petersen*, *supra*, 4 Cal.App.5th at p. 1189.)  A "person need not *know* of the actual negligent cause of an injury; mere *suspicion* of negligence suffices to trigger the limitation period." (*Knowles v. Superior Court* (2004) 118 Cal.App.4th 1290, 1295; see *Kernan v. Regents of University of California* (2022) 83 Cal.App.5th 675, 681 ["the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was

13

caused by wrongdoing"], italics omitted.)  "A patient 'is charged with "presumptive" knowledge of his negligent injury, and the statute commences to run, once he has '"notice or information of circumstances to put a reasonable person *on inquiry*, or *has the opportunity to obtain knowledge* from sources open to his investigation . . . .""'  [Citation.]  'It is irrelevant that the plaintiff is ignorant of his legal remedy or the legal theories underlying his cause of action.'"  (*Carrillo v. County of Santa Clara* (2023) 89 Cal.App.5th 227, 235; see *Brewer v. Remington* (2020) 46 Cal.App.5th 14, 24.)

Ito alleged Dr. Waldron and Dr. Roque were negligent in denying his requests for referrals to a neuroscientist or neurologist, denying him "high resolution brain imaging," and misdiagnosing him with a psychiatric disorder.  He alleged their negligence harmed him "because he was unable to [see] the neuroscientist or neurologist that he wanted to have seen due to multiple misdiagnoses."  The undisputed evidence showed Ito asked Dr. Waldron or Dr. Roque for a referral to a neuroscientist, for advanced imaging (including fMRI, transcranial focused ultrasound, and holography), or both, at least 10 times between May 24, 2021 and January 31, 2022.  Each time Dr. Waldron or Dr. Roque (or a member of his or her staff) denied Ito's request.  Ito's medical providers repeatedly told him that neuroscience was not a clinical field and that Kaiser did not have any neuroscientists and referred Ito to the psychiatry department.  Therefore, no later than January 31, 2022 (and probably months earlier), Ito knew or reasonably should have discovered his injury

14

and who allegedly caused it.[3]  Because Ito filed this action on February 14, 2023, more than one year later, it is barred by the statute of limitations.

In his reply brief Ito argues there was a triable issue of fact regarding whether he "should have suspected Kaiser's negligence by January 31, 2022."  Ito argues it "is plausible" he did not realize his "neurological condition" was "worsened by Kaiser's inaction" until after February 14, 2022, which would bring his complaint within the one-year period.  Ito argues that only "when it became undeniable that a physical neurological problem existed (perhaps through subsequent testing or worsening symptoms) would a reasonable person in [his] position realize that Kaiser's earlier care had been wrongful."  By failing to raise this argument in his opening brief, however, Ito forfeited it.  (See *Gund v. County of Trinity* (2020) 10 Cal.5th 503, 525 [arguments raised for the first time in a reply brief are forfeited]; *Grossmont Union High School Dist. v. Diego Plus Education Corp.* (2023) 98 Cal.App.5th 552, 591 [same]; *Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1387-1388 ["We will not consider arguments raised for the first time in a reply brief, because it deprives [the respondent] of the opportunity to respond to the argument."].)

Even if Ito had not forfeited the argument, the evidence would not allow a reasonable trier of fact to find he discovered his injury less than one year before he filed this action.  This is not a

---

[3]  At the hearing on Kaiser's motion for summary judgment Ito admitted that on June 7, 2021, when Dr. Waldron concluded Ito had obsessive compulsive disorder and referred him to the psychiatry department instead of to a neuroscientist, he believed he had received negligent medical services.

15

case where a plaintiff was diagnosed with a serious condition the defendant failed to diagnose earlier.[4] (See, e.g., *Filosa v. Alagappan*, *supra*, 59 Cal.App.5th at p. 784 [plaintiff alleged his health care providers "negligently failed to diagnose a brain tumor when he underwent an MRI"]; *Drexler v. Petersen*, *supra*, 4 Cal.App.5th at p. 1184 [plaintiff alleged his physicians negligently misdiagnosed the cause of his headaches, which an emergency room doctor later diagnosed as a brain tumor].) Ito did not present any evidence that his symptoms worsened, that subsequent testing revealed a neurological condition,[5] or that any medical provider ever diagnosed him with anything other than a psychiatric condition. The only injury Ito alleged was that his physicians misdiagnosed him with a psychiatric disorder and refused to refer him to a neuroscientist or neurologist or to order advanced imaging. Ito knew of, or reasonably should have discovered, that injury when it occurred, more than one year before he filed this action.

> 2. *Kaiser Was Not Directly or Vicariously Liable for Negligence*

The trial court also ruled Kaiser was not vicariously liable for medical care provided by Ito's medical providers. The

---

[4]     In such a case the plaintiff "may discover the injury when the undiagnosed condition develops into a more serious condition, but before it causes the ultimate harm." (*Drexler v. Petersen*, *supra*, 4 Cal.App.5th at p. 1194.)

[5]     In June 2023, after Ito filed this action, he obtained an fMRI at an MRI imaging center. Ito does not argue that test revealed a neurological condition.

16

undisputed evidence showed that Kaiser was a health care service plan licensed by the California Department of Managed Health Care under the Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 et seq.), that Kaiser contracted with Southern California Permanente Medical Group and Kaiser Foundation Hospitals to provide medical and hospital services to its members, and that physicians and staff employed by Southern California Permanente Medical Group and Kaiser Foundation Hospitals, not Kaiser, provided medical care to Ito. A health care service plan is not vicariously liable for the acts or omissions of its medical groups. (See Health & Saf. Code, § 1371.25 ["A plan, any entity contracting with a plan, and providers are each responsible for their own acts or omissions, and are not liable for the acts or omissions of, or the costs of defending, others."]; *Gopal v. Kaiser Foundation Health Plan, Inc.* (2016) 248 Cal.App.4th 425, 431 ["Knox-Keene bars claims against a plan for vicarious liability"]; *Martin v. PacifiCare of California* (2011) 198 Cal.App.4th 1390, 1401 [Health and Safety Code section 1371.25 barred the plaintiffs' causes of action against a health care service plan for its medical service provider's unreasonable delay in providing medical care].)

Ito concedes Kaiser "cannot be held *vicariously* liable for malpractice committed solely by a treating physician or hospital," but argues "Kaiser *itself* breached a direct duty to arrange timely, necessary care." Ito forfeited this argument by raising it for the first time on appeal. (See *Cook v. University of Southern California* (2024) 102 Cal.App.5th 312, 325 [""Failure to raise specific challenges in the trial court forfeits the claim on appeal.""]; *Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1065 ["Having failed to raise or

17

develop this issue in the trial court, plaintiffs cannot raise the issue for the first time on appeal."].)

Even if not forfeited, the argument is meritless. Ito relies on Civil Code section 3428 (section 3428), subdivision (a), which states a health care service plan "shall have a duty of ordinary care to arrange for the provision of medically necessary health care service to its subscribers and enrollees, where the health care service is a benefit provided under the plan, and shall be liable for any and all harm legally caused by its failure to exercise that ordinary care" where the "failure to exercise ordinary care resulted in the denial, delay, or modification of the health care service recommended for, or furnished to, a subscriber" and the subscriber "suffered substantial harm." Ito argues "Kaiser's breach consisted of its systemic failure to get [him] to an appropriate specialist and the consequent mismanagement of his condition." The evidence, however, would not allow a reasonable trier of fact to find Kaiser breached its duty of care to Ito.

Under section 3428, subdivision (a), Kaiser could be liable if it failed to provide "medically necessary health care service" resulting in the "denial" of a service "recommended for" Ito.[6] But Kaiser presented evidence the services Ito requested were neither

---

[6]     As discussed, section 3428, subdivision (a), also requires that the plaintiff prove the health care service plan's breach caused the plaintiff substantial harm and that the plaintiff exhausted the plan's "independent review system" procedures before filing an action. (§ 3428, subd. (k)(1); see *Martin v. PacifiCare of California, supra,* 198 Cal.App.4th at p. 1406 [section 3428 "requires subscribers to exhaust the appeals process with the plan before raising a claim"]; *Watanabe v. California Physicians' Service* (2008) 169 Cal.App.4th 56, 66 [same].)

18

medically necessary nor recommended.  Ito repeatedly asked his physicians to refer him to a neuroscientist and to order advanced imaging, but they never recommended any of the services Ito requested.  To the contrary, Ito's physicians told him none of those services was medically indicated.  Dr. Waldron recommended Ito seek treatment from Dr. Roque, and Dr. Roque recommended therapy and anti-psychotic medication.  Dr. Alexander, Kaiser's expert, stated that Ito "did not require any referrals to a neuroscientist or neurologist," that "the correct referral per the standard of care of a treating physician was always a referral to Psychiatry," and that "Dr. Roque appropriately diagnosed Mr. Ito with a psychiatric condition and recommended medication management."  Dr. Alexander also stated that Ito did not need an EEG and that an fMRI is "not used in clinical practice," "is typically used as a research tool to measure metabolic changes in the brain," and "was never medically indicated."  Dr. Alexander further stated a transcranial focused ultrasound, which "is used to treat tremors" and "is not a diagnostic test," was "never medically indicated."

Ito argues the declaration of his expert, Dr. Desai, created a triable issue of material fact regarding whether Kaiser breached its duty of care.  Dr. Desai opined Kaiser breached its duty of care to Ito through "misdiagnosis and denial of crucial neurological evaluations" and by failing "to consider all plausible explanations for" Ito's symptoms.  Acknowledging that none of Ito's physicians recommended the services he requested (as section 3428 requires), Ito argues for the first time in his reply brief that "Dr. Desai's declaration effectively serves that function."  It did not.  Section 3428, subdivision (b), states the "health care services need not be recommended . . . by an in-plan provider, but may be

19

recommended . . . by any health care provider practicing within the scope of his or her practice . . . at any time prior to the inception of the action." Dr. Desai submitted his declaration as Ito's expert witness, not as a "health care provider practicing within the scope" of his practice. Dr. Desai's December 29, 2023 declaration did not say that he treated Ito, that he "recommended" any health care service for Ito, or that he did so "prior to the inception of the action" in February 2023.[7]

## DISPOSITION

The judgment is affirmed. Kaiser is to recover its costs on appeal.

SEGAL, Acting P. J.

We concur:

FEUER, J.          STONE, J.

---

[7] Ito also argues the trial court erred in denying his motion for summary judgment. An "order denying a motion for summary judgment, while not directly appealable, may be reviewed on appeal from the final judgment." (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 836; see *Roger v. County of Riverside* (2020) 44 Cal.App.5th 510, 532 ["'A prior nonappealable order or ruling need not be specified in the notice of appeal from a subsequent appealable judgment.'"].) Because the trial court did not err in granting Kaiser's motion for summary judgment, any error in denying Ito's motion was harmless. (See *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 343.)